STATE OF WEST VIRGINIA *v.* ELDA ROBERTS

(No. 9042)

Submitted September 24, 1940. Decided October 15, 1940.

*E. L. Phillips* and *W. M. Holroyd,* for plaintiff in error.
*Clarence W. Meadows,* Attorney General, and *Kenneth E. Hines,* Assistant Attorney General, for defendant in error.

Fox, Judge:

At the October term, 1938, of the Circuit Court of Wyoming County, Elda Roberts was indicted for the murder of Enoch White. Upon the trial on the indictment the defendant was found guilty of voluntary manslaughter, and on April 17, 1939, the trial court fixed his punishment "at indeterminately one to five years' imprisonment in the Penitentiary of this State * * * ." Prior to the sentence motions were made in arrest of judgment and to set aside the verdict of the jury, which were overruled, and exceptions were taken. On errors alleged, this Court granted a writ of error.

One of the errors assigned is to the giving of State's Instruction No. 1. This instruction told the jury that any one of five verdicts might be found under the indictment, defined the nature of the various offenses covered thereby, and instructed the jury as to the punishment for each. The refusal to give this identical instruction was held error in *State* v. *Whitt,* 96 W. Va. 268, 122 S. E. 742; 2 Lee's Criminal Trials, 888, so that any objection to the form of the instruction is without merit. It is contended, however, that the provisions of Chapter 24, Acts of the Legislature, 1939, Code 61-10-16, 1939 Michie's Supplement, which provide for what is known as indeterminate sentences, made the giving of this instruction improper. We are unable to see the force of this contention. The punishment for manslaughter still remains the same, and the court's sen-

tence amounts to nothing more than a sentence of from one to five years in the penitentiary, the exact term of which may be determined by considerations which would have had no bearing upon the action of the jury in finding the defendant guilty.

Another of the errors assigned is that the verdict of the jury should have been set aside on account of an alleged irregularity in the trial which occurred during the preparation of the jury list. A panel of twenty jurors was drawn and examined. Some of them were released from service for various reasons, and others called and substituted. The clerk, in making up the list for the use of counsel in striking the jury, omitted to remove the name of one person who had been relieved of service, and to replace the same with another person who had been called and qualified. The state exercised its right to strike two names from the list, and the defendant and his counsel, upon examining the list, discovered the error mentioned, and called the attention of the clerk thereto. This mistake was discovered in a room near or adjoining the court room. The clerk then took the list, returned to the court room, and made the proper correction. The list was then returned to defendant's counsel, who exercised their right to strike from the list as corrected, and returned to the court room without calling the court's attention to what had occurred. We do not think the refusal of the court to set aside the verdict on this ground was error which could in any way have prejudiced the defendant. The act of qualifying the jury occurred in the presence of the court and the defendant. It was the ministerial duty of the clerk to make proper notation of such action. The correction of the clerical error was not such a proceeding as to come within the general rule that the defendant must be present in person from the inception of the trial on a felony indictment to the final judgment, when anything is done affecting him, as in *State* v. *Parsons,* 39 W. Va. 464, 19 S. E. 876; *State* v. *Martin,* 120 W. Va. 229, 197 S. E. 727. It created a situation controlled in principle by *State* v. *Lucas,* 103 W. Va. 743, 138 S. E. 393.

The third assignment of error is that the defendant was prejudiced by the action of the court in committing the prisoner to the custody of the sheriff during the trial. This, we think, is not unusual in the trial of felony cases. It is true the defendant was under bond, and it may be, —although the bond not being before us we do not pass upon that question,—that its terms would have held the defendant to continued appearance during the trial until released by the court. The usual terms of a recognizance or bond are that the principal shall appear before the court upon a day certain and not depart therefrom without leave of court. However this may be, even if there had been objection at the time—and there was none—, the court committed no prejudicial error in committing the defendant to the custody of the sheriff while the trial was in progress.

The defendant complains of the refusal of the court to give his Instructions Nos. 13 and 24. We think Instruction No. 13 is fairly covered by other instructions given at the instance of the defendant, and for that reason its refusal was not error. Instruction No. 24 would have told the jury, in effect, that if they found that the deceased and Constable McKinney went upon the property of the defendant without authority, " * * * then the jury shall find that said White and McKinney were trespassers and entered upon said premises at their own risk." The vice of this instruction is that it might reasonably have been interpreted by the jury to warrant the shooting of the trespassers by the defendant. The mere trespass to real estate does not alone warrant shooting a trespasser. We think this instruction was properly refused.

The remaining question bears upon the merits of the case. Defendant says that under the evidence the jury was not warranted in finding him guilty of any crime.

There is confusion in the evidence as to what actually occurred at the time Enoch White was killed, but some of the background seems clear. The killing occurred on the 9th day of August, 1938, about ten-thirty o'clock at night. Earlier in the day one Dave Walton had some dif-

ficulty with the defendant, Elda Roberts, and a man by the name of Hardrock Church. Roberts admits that he slapped Walton, and it is contended that Church made an attack upon him, bruised his body, made a cut in the back of his head which bled, and tore his clothes. Walton, who seems to have been in an intoxicated condition, left the Roberts home, went to Herndon and made complaint to Constable Alda McKinney as to the alleged assault. According to the testimony of the defendant, his mother, who was the wife of Walton, told him that before Walton left for Herndon he told her that "he was going to get some buddies and a gun and come back here and clean this ridge up." After Walton met McKinney, they endeavored to find a justice of the peace before whom they could make complaint, and secure a warrant for the arrest of Church and Roberts, but were unsuccessful. They finally went to a filling station operated by Enoch White, then a deputy sheriff of Wyoming County, and told him of their efforts. He advised them that they did not need a warrant, so all three, Walton, White, and McKinney, went to the defendant's home. White and McKinney stationed themselves on the Roberts property about 150 feet from the house, while Walton made two trips to the home. It seems that on the first trip, at the instance of White and McKinney and with money furnished by them, he tried to purchase liquor from the defendant, but failed. When he went to the home the second time, Walton, testifying for the state, says that defendant told him that his clothes were packed, and to take them and "get off that hill." When he left the house, the defendant, having obtained a .22 single-shot rifle, accompanied him and carried the suit case to a point near where White and McKinney were waiting. Here the evidence becomes confused. It seems certain that McKinney asked the defendant where he was going with the gun. Defendant replied that he was looking for Church. What then occurred may be stated in the language of McKinney, testifying for the state: "About that time, I seen Mr. White make a move and kind of turned my head to see what he had done and he had his

gun on Roberts." The defendant then shot White, firing the rifle from his hip, and then turned immediately and compelled McKinney to drop the pistol he had in his hand. White, in the meantime, had recovered to some extent, and fired from the ground striking Roberts in the hip, and Roberts then fired a second and possibly a third shot at White. As the result of one of these shots, White died within a few hours. Another version, that of Walton, is that when McKinney inquired of the defendant what he was doing with a gun, he then compelled McKinney to drop his gun and that the shooting of White occurred after that time. Undoubtedly, the first shot was fired by defendant. The defendant testifies that before the second shot, he "told" White twice not to shoot, and in this he is corroborated, to some extent, by his wife. On the other hand, Walton says that McKinney begged the defendant not to shoot him before any of the shooting began. There is no dispute as to the contention of the defendant that, at the time of the shooting, he knew neither White nor McKinney, did not know that they were officers, and did not know that they had come to his home for the purpose of placing him under arrest, unless such dispute arises from the statement of Walton that McKinney at the time he "begged" defendant not to shoot him said, "I am an officer of the law." It is significant that McKinney does not testify as to any such statement. On the whole, it is fair to say that the defendant had the right to assume, when he first learned that White and McKinney were armed, that they had come to his home with Walton on an unfriendly mission. Both White and McKinney weighed in excess of two hundred pounds and Roberts was a small man weighing about one hundred and forty pounds.

It can scarcely be said that either White or McKinney, on the information before them, had the right to assume that a felony had been committed; and certainly no offense had been committed in the presence of either of them. Therefore, when they went on the property of the defendant, they were trespassers, and while that act,

alone, did not justify the defendant's conduct, it deprived them of the protection which the law throws around officials engaged in lawful duty. Furthermore, while they had no right to be there, their situation would have been improved had they indicated to Roberts that they were officers of the law and had come there to arrest him. The situation as developed from the standpoint of the defendant was that three men, at least one of whom he had reason to believe was bent on mischief, came to his home in the nighttime. Being apprehensive of this situation, he committed the error of leaving his home, and doing so carried a gun, which, being on his own premises, he had the right to do. White and McKinney were both armed, and when one of them drew a pistol on him, the defendant, being in the dark as to their identity and purpose, was not required to remain inactive but under the right of self-defense was entitled to protect himself against the danger of death or great bodily harm. We are of the opinion that the rule in cases of this character which requires a showing of guilt beyond reasonable doubt will not permit the conviction of the defendant to stand on the testimony developed in this case. True, there is confusion as to certain points, but the evidence in favor of the defendant is of such a character as to preponderate in favor of his contention, and certainly raises that reasonable doubt which the jury should have resolved in his favor.

We are of the opinion that the evidence did not warrant the conviction of the defendant, and the judgment of the Circuit Court of Wyoming County is reversed, the verdict of the jury set aside, and the case remanded for a new trial.

*Judgment reversed; verdict set aside; new trial granted.*