# CHARLESTON.

## STATE *v.* FRANK LUCAS

### (No. 5867)

#### Submitted May 11, 1927.     Decided May 24, 1927.

1. CRIMINAL LAW—*To Support Motion for Change of Venue, Facts Must be Shown Sufficient to Satisfy Court That Fair Trial Cannot be Had in County; in Prosecution for Murder, Refusal of Change of Venue on Defendant's Affidavit of Prejudice in Locality Held Proper.*

    To support a motion for a change of venue, facts and circumstances must be shown sufficient to satisfy the court that a fair trial cannot be had in the county.

    (Criminal Law. 16 C. J. § 320.)

2. SAME—*Clerk's Calling Names of 12 Jurors After Completion of Challenges and Before Jury Are Sworn in Felony Case, in Absence of Accused, is Not Prejudicial Error (Code, c. 159, § 2).*

    The mere calling of the names of the twelve jurors by the clerk after the challenges have been completed and before the jury are sworn to try the issue joined in a felony case, in the absence of the accused, is not prejudicial error.

    (Criminal Law, 16 C. J. § 2067.)

3. HOMICIDE—*All Elements Constituting Corpus Delicti in Homicide Case May be Proved by Circumstantial Evidence Convincing Jury Beyond Reasonable Doubt; Circumstantial Evidence Held to Support Conviction for Second Degree Murder.*

    All the elements constituting the *corpus delicti* in a homicide case may be proved by cimcumstantial evidence which convinces the jury beyond a reasonable doubt that the crime charged was committed.

    (Homicide, 30 C. J. § 529.)

    (NOTE:  Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Error to Circuit Court, Logan County.

Frank Lucas was convicted of second. degree murder, and he brings error.

*Affirmed.*

*J. Raymond Gordon* and *A. M. Belcher,* for plaintiff in error.

*Howard B. Lee,* Attorney General and *J. Luther Wolfe,* Assistant Attorney General, for the State.

MILLER, JUDGE:

The defendant was indicted jointly with C. E. Robertson and A. L. Wooten, charged with the murder of George Thompson. The State elected to try Lucas separately, and he was convicted of second degree murder, and sentenced to confinement in the state penitentiary for a period of eighteen years.

The first point presented by this writ of error is the action of the trial court in overruling defendant's motion for a change of venue. The only matters of fact alleged in his affidavit in support of this motion are that a strong feeling against him existed in the community immediately after the affair which resulted in Thompson's death; that after waiving preliminary hearing, he was taken to the Cabell county jail for safe keeping because of such feeling; that while he was in the Logan county jail, it was deemed necessary to have the jail specially guarded to prevent sympathizers of George Thompson from killing him; and that it would be impossible for him to get a fair trial in Logan county. No other affidavit or evidence was tendered in support of the motion; and from the record before us there is nothing to show that the defendant was prejudiced by the action of the court in overruling said motion. "The affidavit of the prisoner which states only his opinion that local prejudice exists against him to such an extent that he can not obtain a fair trial is not sufficient to support his motion for a change of venue. Facts and circumstances must be shown, preferably by disinterested persons, sufficient to satisfy the court that a fair trial can not be had." *State* v. *Lutz,* 88 W. Va. 502.

Defendant's motion for a continuance was overruled. This motion was based on the absence of one Sid Moore, whom defendant claimed was a material witness. The only fact defendant said he expected to prove by Moore that he could not

prove by any other witness was that Moore saw the deceased attempt to strike him and go through motions that warranted him in feeling that the deceased was going to shoot him. He admitted that several others were present at the time, but had not talked with them and did not know what they could swear to. From the testimony of the sheriff and one of his deputies it appears that Moore was also charged with the murder of Thompson, and that a warrant had been in the hands of the sheriff or his deputies for some time, and that diligent search had failed to reveal where Moore was; and it was the opinion of the officers that it was probable that he never would be found. Defendant had no idea where he was. On this evidence the trial court properly overruled the motion for a continuance.

The next point, strongly urged, is that certain steps were taken on the trial of the case in the absence of the defendant. It appears that after the defendant had pleaded "not guilty," and the panel of twenty qualified jurors had been selected, their names were written each on a separate card and handed to the prosecuting attorney, who withdrew two of the cards and passed the remaining eighteen to defendant's counsel. Counsel and the prisoner retired to an adjoining room to select the jurors they desired to challenge, and (quoting from the bill of exceptions) "after some time had been spent in the exercise of the challenge of the jury, the defendant's counsel returned into the court room with a list of the petit jurors which had been challenged in one hand, and those that were to sit in the case in the other, and announced to the court that the defendant had completed his challenge. And handed another bunch of cards containing the names of the challenges to Tilda Ellis, deputy clerk of the circuit court, and thereupon the said Tilda Ellis called some of the jurors out of the full panel of jurors which were to sit on the defendant's case and which did sit on the case, thereby excluding the challenged jurors, all of this was done in the absence of this defendant who was at that time back in a witness room with the door closed, in the rear portion of the court house." The only act done by the deputy clerk, and the only proceeding

taken in the absence of the prisoner, was to begin the separa-
tion of the twelve jurors who had been selected to sit on the
trial of the case from the eight challenged by the State and
the defendant, and to exclude the eight from the whole panel
of twenty called and examined for qualification.

Defendant relies on section 2 of chapter 159 of the Code,
that ''a person indicted for a felony shall be personally pres-
ent during the trial therefor,'' and the decisions thereunder,
particularly *State* v. *Parsons,* 39 W. Va. 464, and *State* v.
*Stevenson,* 64 W. Va. 392. These and the other cases cited
do hold that the accused shall be present in person *when any-
thing is done to affect him;* but where was anything done to
affect the defendant in this case while he was absent from the
court room. The challenge was complete. The twelve had
already been selected and agreed upon by the parties. All
that remained before the swearing of the jury to try the case,
was the placing of the twelve in the jury box, and the dismiss-
ing of those struck off by the parties. The mere act of read-
ing the names of those jurors who had been selected to sit in
the case could not *affect* the defendant. No statute or rule
of law prescribes any particular procedure for placing the
jury in the jury box, and strictly this act on the part of the
clerk is no part of the trial, as contemplated by section 2 of
chapter 159 of the Code.

The defendant claims that the fact of the homicide was not
established; that the evidence does not prove that deceased
came to his death by any act of the defendant.

From the evidence it appears that Lucas, Robertson and
Wooten were driving about the city of Logan late in the
evening in Robertson's Dodge Coupe when they met a young
man by the name of Sid Moore, whom Lucas knew. Lucas
asked Moore where they could get some whiskey. Moore re-
plied that they could get it at George Thompson's, about two
or three miles from Logan. The four men went there.
Thompson lived in a house of three rooms and a back porch.
Two of the rooms had front doors or entrances from the street.
The room occupied by Thompson was not connected with

either of the other rooms by a door.   In the rear of the other front room was a kitchen communicating with that room. This room and the kitchen were occupied by Mrs. Helena Riggs and her two small children.   There were doors from the kitchen and from Thompson's room opening on the porch. The men testified that they purchased two bottles of liquor from Mrs. Roberts, the mother of Mrs. Riggs, one of which was handed into the kitchen by Thompson through the door to the porch.   They say they drank the liquor in the kitchen and in Mrs. Riggs' bedroom.   Mrs. Riggs was in bed and did not get up, but talked with them while they sat there.   The women say that no liquor was sold; that there was none in the house.   They say that the men, with the exception of Robertson, were intoxicated when they arrived, and that they did not know any of the men,—had never seen them before.

The women testified that after the visitors had been in the house for some time, Thompson came to the front door and asked what those men were doing there, and that Mrs. Roberts replied they wanted a pint of whiskey.   He then said, "You know there is no whiskey here.   Why don't you put them out?"   And Mrs. Roberts answered that they were going in a minute; and said to Moore:   "You get them out of here. The old man wants to go to bed."   At that time Wooten and Lucas were in the kitchen or went there soon afterwards. Mrs. Roberts testified that later Wooten came running in and said:   "Moore, let's get Frank away from here.   He has flopped a man."   Mrs. Riggs also testified that her fourteen year old brother came in and said:   "They have knocked Uncle George down."   The two women then went to the porch where they found Thompson lying on the concrete floor. With the assistance of some neighbors who came in, they carried him to his bed, where he died, ten or fifteen minutes later.

The women and Robertson seem to have been in the bedroom at the time Thompson was struck, and did not hear what occurred between him and defendant or Wooten.   State's witness Fred Elkins, who lived between twenty-five and forty feet from Thompson's home, testified that he was attracted by noise coming from the porch, raised up on his elbow in

bed, and saw Thompson go across the porch to the kitchen door, and hear him say: "Boys, you fellows had better quit making so much noise around here. I have been sick and want to go to bed. If you don't quit making so much noise and don't quit shooting dice in there I am going to call the State Police." Defendant answered: "To Hell with the State Police, old man. You fool with me, I will break your God damned jaw." This witness testified that when defendant said that, he struck Thompson on the cheek with his fist and knocked him back against the door, and as he was going down struck him a second time with something he got from his hip pocket, "either a blackjack, brick, or rock or something, * * * looked as though he was hitting him back of his head." This witness said he could see what occurred clearly; that the lights in Thompson's room and the kitchen were shining on the porch through the open doors. Willis Roberts, a son of the woman who it is claimed sold the whiskey to the men, testified that he was in the kitchen when Thompson came to the door, "and told all of us, 'you boys get out of here, shooting dice, or I will call the State Police on you.' Well, I was just fixed to go out, and Lucas raised up and said, 'Old man, I will break your jaw,' and this other fellow that had the dice got hold of him and told him that he would not do that if he was him, he wouldn't do it there. I just walked out and that is all I know about it." The witness Collier testfiied that he and one Columbus Reedy, with whom he was living, drove to Thompson's place to get some liquor; that he "went in the front way and went to the back. I seen two or three men standing on the porch, and I stopped, and I heard the old man say, 'You fellows get out of here.' * * * And somebody said, 'I am going to break your jaw,' and he grabbed him by the collar this way, and struck him with his fist, and then he grabbed something or other out of his hip pocket and struck him in the head with it, and when he struck him with that, I run back to the car." He says he was standing within six or eight feet of the men. He knew Thompson, but did not know the man who struck him, or what kind of a weapon he used.

Other witnesses living in the neighborhood testified that they heard loud talking at Thompson's home, and saw the men hurriedly leave there. One witness heard one of the men say: "I knocked the block out from under that old fellow proper." After the trouble the four men started for Charleston in Robertson's automobile. The witnesses Pugh and Bowling, between eleven and twelve o'clock the same night, while traveling toward Logan in a truck, passed four men standing by a Dodge Coupe. They stopped and asked what was the matter, and one of the four said: "One of our buddies killed a man down in Logan." A member of the department of public safety, who arrived shortly after the arrest of three of the men at Sharpless, asked them which one of them killed Thompson, and testified that one said: " 'Crip' croaked him with a brick."

The defendant testified that he and one or two others were shooting dice in the kitchen when Thompson came to the door and threatened to call the state police if they did not get out; defendant said, "We had better get away from here," and started for the door, and said to Thompson, "Get out of the way;" but Thompson said, "Wait a minute," and closed his hand up and clenched it, and refused to get out of the way, and defendant struck him on the shoulder with his hand. On cross-examination defendant testified: "Q. And when you struck this old man with your fist you knocked his head up against the side of the building? A. I guess when I hit I did, but not at that time." "Q. The old man was lying down there on that concrete floor at the time this man Robertson came out, wasn't he? A. I don't know whether he was lying on the floor when Robertson came out. I guess he was." He said he struck but one blow, the one with his hand. Wooten testified that defendant struck Thompson with his fist, but did not remember what defendant said; that "The only lick I saw was one lick passed; what happened afterwards I don't know. * * * The first lick was with his fist, and I turned and walked away;" that he then went into the bedroom and called Moore; and that he saw nothing further. Robertson testified that he was in the bedroom with

Moore at the time and did not see what occurred, but heard something about summoning the state police; and that when he crossed the porch in leaving he did not see Thompson. Moore left the house with the others in Robertson's automobile, but escaped before the three were arrested, and had not been found at the time of the trial.

An autopsy was held the following day by the undertaker and two physicians, Drs. Farley and Hill. They found a contusion on the back of Thompson's head, about the size of a dime or nickel, just below the most prominent part of the occipital protuberance. The skull was not fractured, but the scalp was broken loose from the skull, and slightly cut. A large blood clot was found directly behind and below the bruised place, down under the cerebrum, next to the cerebellum, or where the spinal cord goes into the brain, and a small clot between the two hemispheres of the brain, and more or less blood diffused all over the skull.

The defense puts much reliance on the fact that neither of the physicians would say positively that the lick which made the scalp wound was the cause of Thompson's death, or that death was not due to apoplexy from some other cause; but each testified that such a blow could cause death and the condition they found in the brain cavity. Dr. Hill, when asked if he would have taken into consideration the fact that the deceased might have or probably did come to his death as the result of apoplexy, had he without knowing anything about the history of the case been called to diagnose the cause of death, answered: "Finding him there with any abrasion that might be about the head or scalp like there was, naturally it would lead you to believe that there was some cause for this other than ordinary apoplexy." Each of the physicians testified that a blow on the head might cause rupture of a blood vessel on the inside of the skull without indenting or fracturing the skull in any way. No examination was made to ascertain if the deceased was afflicted with heart disease, hardening of the arteries, or other malady that might cause sudden death from fright or excitement.

The case of *State* v. *Roush,* 95 W. Va. 132, is relied on to reverse this case on the evidence. But in that case the evidence showed that the defendant was a young man, 21 years of age, of slight stature, whose arms had been injured and incapacitated by a railway accident; that he struck the deceased two blows with his bare fist, leaving slight discolorations of the skin; that the deceased was a large, robust man, weighing 247 pounds, and had been within a few hours previous drinking moonshine and other intoxicating liquors; that upon being struck he sank slowly as if lying down, the autopsy disclosing a blood clot at the base of the brain as the cause of death, but no congestion of the brain, nor any internal injuries to the brain except the blood clot; that there was a slight discoloration on the inside of the skin on the back of the head discernible only after the scalp had been removed.

The facts in this case are entirely different. The defendant was 25 years of age; what his occupation was does not appear, but he had engaged in a "prize fight" a few nights previous; the deceased was an elderly man, 73 years of age; there is no evidence that he had been drinking intoxicating liquor; there is evidence of a deadly weapon; the wound on the head was clearly discernible, so much so that one of the physicians at first thought the skull was fractured, and witnesses testified that blood was found on the porch after the deceased was removed to his room, and blood came from the wound after his removal. A blackjack was found in a suitcase in the automobile in which the four men left Thompson's place, though Robertson testified it belonged to him, and had not been taken out of the suitcase while they were there. And while the physicians testified that a man of deceased's age was more liable to have hardening of the arteries or to die of apoplexy than a man under fifty, there is no evidence tending to show that he was so afflicted.

While our cases hold that both the *corpus delicti,* or criminal act, and the agency of the accused in such act must be proved before the jury beyond a reasonable doubt, *State* v. *Flanagan,* 26 W. Va. 116, and *State* v. *Parsons,* 39 W. Va. 464, yet the *corpus delicti* may be proved by circumstantial

evidence. "Direct evidence is not essential to prove the *corpus delicti* in any case. It may be proved as any other fact may be proved which is essential to establish the guilt of the accused, namely, by circumstantial evidence which produces the full assurance of moral certainty on the subject." *State* v. *Toney,* 98 W. Va. 236; 1 Wharton's Criminal Evidence (10th ed.), secs. 11, 12; 1 Wharton's Criminal Law, (11th ed.), secs. 352-355; Underhill's Criminal Evidence, (3rd ed.) secs. 37, 38; 1 Michie on Homicide, secs. 149, 153; 30 C. J. pp. 287-288; 68 L. R. A., Note, pp. 75-78. All that is required is that the evidence convince the jury beyond a reasonable doubt that the deceased came to his death by a criminal act.

The instructions show that the jury were fully charged on the question of reasonable doubt; and they were told that they should find the defendant not guilty if they believed from the evidence that he only struck the deceased with his naked fist without intent to kill him or do him great bodily harm, or if they believed deceased came to his death from an attack of apoplexy, and that the wound on the back of his head was the result of falling, or that death was caused by old age, excitement or hardening of the arteries; and that it was the duty of the State not only to prove the agency of the crime, but also to prove by testimony clear, convincing and trustworthy beyond a reasonable doubt that Thompson's death was caused by blows inflicted by Frank Lucas.

In view of the evidence in this case, all the circumstances surrounding the death of Thompson and the testimony of the physicians who performed the autopsy, and the finding of fact by the jury, it would be going far, indeed, to hold that the verdict was contrary to the evidence. To so hold would be to say that in every case where an elderly man suddenly dies at the same time he is struck a severe blow on the head, the blow could not beyond a reasonable doubt have caused the death.

The judgment will be affirmed.

*Affirmed.*