STATE OF WEST VIRGINIA *v.* CONNIE KOONTZ

(No. 8351)

Submitted January 14, 1936. Decided February 4, 1936.

*G. Gilmer Easley* and *Jas. S. Easley*, for plaintiff in error.

*Homer A. Holt*, Attorney General, and *Kenneth E. Hines*, Assistant Attorney General, for the State.

MAXWELL, JUDGE:

The defendant, Connie Koontz, alias Connie Beller, under sentence of life imprisonment by the circuit court of Greenbrier County upon conviction of murder in the first degree of Lloyd Beller by poison, was awarded this review on writ of error.

After the death of W. A. Beller's wife in the early part of 1927, the defendant came to his home as "housekeeper." She had separated from her husband but was not divorced. She brought with her to the Beller home

two children born to her and her husband. W. A. Beller had four children by his deceased wife. In September, 1928, a child was born to Mrs. Koontz of her relationship with Beller. The names of the children and their ages at the time of the tragedy here recited, were as follows: Goldie Beller 17, Lloyd Beller 15, Paul Beller 14, Murrell Beller 12, Howard Koontz 17, Louise Koontz 14, Fayjean Koontz 6. At the time of the fatal event involved, the family was living at East Rainelle in Greenbrier County.

Lloyd Beller died March 24, 1935. It is the theory of the state that he died of poison—arsenic—purposely administered to him by the defendant on the 12th of March, 1935. Under Code, 61-2-1, murder by poison is murder of the first degree.

By way of preface to a minute discussion of the case, it may be noted that the oxide of arsenic, or white arsenic, which is the common form in which arsenic is used, is employed extensively in preparations for destruction of insects and other vermin. There are other commercial uses. It is highly poisonous. When taste is discernible, it is faint and sweetish. II Wharton & Stille's Med. Jurisp., Secs. 154 *et seq.* Except opium and its derivatives, white arsenic has caused more destruction of life than any other poison. IV Witthaus & Becker, Med. Jurisp. (2nd Ed.) p. 410. Pronounced symptoms of arsenic poisoning are nausea soon followed by abdominal pain and diarrhea. Death may attend within a few hours, which kind of case usually occurs after taking a large amount of arsenic in an empty stomach. But in the majority of instances of arsenical poisoning, the progress of the case is less rapid, the life of the patient, in many cases being prolonged for several days after taking the poison. II Wharton & Stille's Med. Jurisp., Sec. 160.

On the 12th of March, 1935, the seven children returned home for the midday meal, pursuant to custom. W. A. Beller was away at work. That morning, while the children were at school, the defendant had made two plates of chocolate candy. The state takes the view that arsenic was placed by her in the contents of the second

plate, but not of the first. Her testimony is that when she began pouring the candy from the cooking vessel, she noticed that it was too thin; therefore, she refrained from pouring all of it at the time, added sugar from the sugar bowl, recooked the remainder thus augmented by the sugar, and then poured the residue on the second plate. At the noon hour, the children were given the candy, which had been divided by the defendant into sections—that on the first plate into four and the other into three.

Admittedly, she handed with her fingers a piece each to Paul and Murrell, but the record is a little confusing as to just the manner in which Lloyd received his piece, whether she handed to him the plate with the candy on it or whether she put the candy in his pocket while he was drying dishes. Paul and Murrell ate their candy before the meal, Lloyd thereafter. Desperate illness soon developed with the three boys. None of the other children became ill. The testimony warranted the jury in believing that the candy given to the three boys was from the second plate, and that the other children ate the candy from the first plate and did not taste that from the second.

Because of the sickness which overcame them, the three boys returned home from school early in the afternoon. Murrell and Paul came first, Lloyd a little later. Extreme nausea with vomiting had developed. Two other school boys, to whom Lloyd, en route to school, had given each a portion of his candy, were attacked by illness that afternoon, with symptoms similar to those manifested by the Beller boys, but were not so seriously stricken.

The Beller boys were treated at home for several days and then were taken to a hospital at Hinton where Lloyd died. At the time of the trial, the youngest boy, Murrell, had seriously drawn legs—a sort of paralysis—as a result of his illness.

A few weeks prior to the 12th of March, a neighbor woman gave to the defendant some garden seed and blue vitrol and arsenic powder, the two chemicals presumably being intended for extermination of worms and insects

destructive of garden plants. These articles were placed in a sack and for a time were kept on the first floor of the Beller home, but prior to the 12th of March, the entire package had been removed to a storage room on the upper floor, whence it was produced by one of the children after Lloyd's death and delivered to a policeman who went to the home in search of poison. That one of the articles was an arsenic powder is confirmed by a physician who analyzed the same. Whether any of this powder was removed from the package after it was brought to the home is not disclosed by the evidence.

Several physicians testified. Dr. R. C. Cecil was called to the Beller home by the defendant early in the afternoon when the boys returned sick from school. They were vomiting, and had developed abdominal cramps and diarrhea. He did not suspect poisoning. He questioned the defendant closely about what they had eaten, but she did not say anything to him about the candy, nor, in fact, did she mention the candy to anybody until about a week after the children became ill, when, under questioning, she told the boys' father about it. Dr. Cecil prescribed a purgative and emetic, but never came to a definite conclusion as to the cause of their illness.

In a few days, another local physician, Dr. C. I. Wall, was called. He diagnosed the illness of the children as arsenic poisoning, and advised that they be taken to a hospital. After the boys were taken to the hospital, they were treated by Dr. D. W. Ritter, who diagnosed the illness as some sort of metallic poisoning, and, in his testimony, in response to a hypothetical question, said that he thought likely Lloyd Beller was suffering from arsenic poisoning.

Dr. W. F. Work, of Charleston, performed an autopsy on the body of Lloyd Beller, removing the stomach and parts of the intestines and kidneys. He observed that the interior of the stomach was inflamed and raw, covered with mucus. Such a condition, he testified, is indicative of metallic poisoning, and that the chain of symptoms indicated arsenic poisoning.

Dr. McLeoud Gillies, of Charleston, made an examina-

tion and chemical analysis of the organs taken from Lloyd Beller's body. He testified: "The stomach was covered inside with a white, sticky mucus, red and irritated * * * The skin of the stomach was thick and inflamed." This condition, he said, was indicative of an irritating substance in the stomach, and arsenic is irritating; that arsenic could have caused this condition. In response to a hypothetical question reciting the symptoms of the patient before death, Dr. Gillies expressed the opinion that likely the boy was suffering from arsenic poisoning at the time of his death. However, the chemical analysis made by the doctor did not reveal arsenic. He further testified, though, that considering the time which elapsed between the date Lloyd Beller became sick and the date he died, arsenic, if it caused the illness, might very well have been eliminated from the system before the boy died.

The opinion of Dr. Gillies that the failure of the chemical analysis to disclose arsenic in the stomach, kidneys and bowel of the deceased is in no wise conclusive that arsenic was not the cause of the death, stands uncontradicted in the evidence, and is supported by general authority. In Volume 4 of Witthaus & Becker on Medical Jurisprudence, (2nd Ed.), at page 205, it is stated, in substance, that a poisoning can occur and the poison become undetectable in the body of the victim; that this truth is applicable for all poisons. Beck's Medical Jurisprudence, Volume 2, at page 463, is authority for the proposition that the non-discovery of poison in the body is not conclusive that death was not caused by it. It is obvious that when a person who has received poison internally, lives a number of days thereafter, emetically and laxatively purged, and the kidneys functioning, the likelihood of finding traces of the poison in the system would be much less than if death had followed within a few hours. In *Commonwealth* v. *Danz*, 211 Pa. 507, 60 Atl. 1070, the court, discussing the testimony of an expert who had testified that arsenic is eliminated by all the glands of the body, and that if the patient vomits

there will be little arsenic in the body after death, said: "In this he was supported by medical authorities. 'Arsenic is not a strongly cumulative poison. It is temporarily deposited in the liver and other organs of the body after absorption, but it is rapidly eliminated from the system by the urine, bile, and other secretions. Should the person survive for two or three weeks, no trace of poison may be found after death, in consequence of its total elimination during the interim.' Reese's Medical Jurisprudence & Toxicology, 443. And it is not incumbent on the commonwealth to prove that a quantity of poison sufficient to cause death was found in the body, before a jury can be allowed to find that it was the cause of death, if the evidence sufficiently establishes the fact that the poison alleged to have caused death did kill the deceased." See, in conformity, annotation *Joe* v. *State*, 6 Fla. 591, 65 Am. Dec., 579, 587.

In discussion of the matter of proof of cause of death in poisoning cases, the following well-reasoned statement is made in Will's Law of Circumstantial Evidence, at page 392: "It would be most unreasonable, therefore, and lead to the grossest injustice, and in some circumstances to immunity of the worst of crimes, to require, as an imperative rule of law, that the fact of poisoning shall be proved by any special and exclusive medium of proof, when that kind of proof is unattainable, and especially if it has been rendered so by the act of the offender himself. No universal and invariable rule, therefore, can be laid down; and every case must depend upon its own particular circumstances; and, as in all other cases, the *corpus delicti* must be proved by the best evidence which is capable of being adduced, and such an amount and combination of relevant facts, whether direct or circumstantial, as establish the imputed guilt to a moral certainty, and to the exclusion of every other reasonable hypothesis." Consult: Underhill's Criminal Evidence, (4th Ed.) section 550; VI Ency. of Evidence, page 690; III Rice on Evidence, section 483; IV Witthaus & Becker on Medical Jurisp., page 207; *Johnson* v. *State*, 29 Tex. App. 150, 15 S. W. 647.

In the light of the stated general authority in respect of the proving of poisoning by circumstantial evidence, we are of opinion that the jury was well warranted in its belief that the circumstances established in this case proved that a premeditated homicide by poisoning was committed, and that the defendant was the guilty person; that the said circumstances were not only consistent with the guilt of the accused, but were inconsistent with every other reasonable hypothesis. When the defendant made the candy no one besides herself was in the house, so she alone was responsible for its contents. If the Beller boys and no others had become ill, there might be room to doubt whether the candy caused their illness, but, since two school friends to whom Lloyd gave part of his candy, became similarly ill, the conclusion is irresistible that some ingredient of the second plate of candy was the cause. The circumstances all point one way—arsenic, implanted by the defendant. The jury gave no credence to the defendant's suggestion that if there was arsenic in the second plate of candy, it must have been put in the sugar bowl by Goldie to poison the defendant.

It is said that the *corpus delicti* was not established. In felonious homicide, the *corpus delicti* consists of two essential elements: First, the death; and second, the existence of criminal agency as its cause. 1 Michie on Homicide, p. 572; Underhill's Criminal Evidence, (4th Ed.) Sec. 545. Here, the fact of death is not questioned; the criminal agency appears from the circumstances; and, that arsenic poison was the means employed was proven in such manner as to establish an abiding conviction of the truth of the charge. Proof beyond a reasonable doubt does not mean proof to mathematical exactitude, but to a moral certainty.

It is urged that no motive was established. Possibly not, by direct evidence; but it was for the jury to consider whether the circumstances indicated motive. They might readily have inferred that there was desire on the part of the defendant to rid the household of the rapidly maturing children of her paramour. But motive need not be established. "In a prosecution for homicide it is

competent to infer the motives of defendant from his actions. But the state need not prove a motive for the commission of the crime." 1 Michie on Homicide, p. 570. The affirmation or negation of motive may be evidentially helpful, but it is not, like malice and intent, an essential element. "There can be no escape from punishment for crime when all the elements of it are proved, whether the evidence be positive or circumstantial, simply because the motive lies hidden in the heart of the only one who knows it." *Commonwealth* v. *Danz, supra.*

Therefore, we conclude that the defendant's point of error that the verdict is not supported by the evidence is not well grounded. The fact that she had presided over the Beller home as a mother to all the children and with a minimum of discord, and that after the three boys became ill, she ministered to them with apparent faithfulness, does not raise such element of doubt as can counteract the overwhelming and convincing circumstances established by the state.

Exception was taken by the defendant to the action of the court in overruling her objection to certain hypothetical questions propounded by the state's attorney to Drs. Work, Ritter and Gillies. Of that group of questions, the following one propounded to Dr. Gillies is pointed out as particularly objectionable: "Assuming that Lloyd Beller, that the stomach of Lloyd Beller upon which you made the autopsy was inflamed, and corroded, that there were no marks of burns in the mouth and no blue lining around the teeth, that there was no substance on the gums, no jaundice and assuming further that there was paralysis to the waist and the dehydration, state if you can whether in your opinion he was suffering from arsenic poison at the time of death?"

It is urged that the assumptions of fact in the question are not in accord with the proof, first, wherein it is recited that there were no marks of burns in the mouth, and, second, wherein it is assumed that there was paralysis to the waist. Counsel for the defendant emphasize that Dr. Cecil and Dr. Ritter testified that Lloyd Beller had sores about his mouth and nose. True, but that is not

the basis for the assumption in the hypothetical question. The assumption in the question is with reference to burns *in* Lloyd's mouth, and, that there were none was testified by Dr. Ritter, who, when asked about the condition of the interior of Lloyd's mouth, replied that it was "practically normal." The purpose of this premise in the hypothetical question was to eliminate the hypothesis of Lloyd's stomach having been burned by acid, the medical testimony having been that any acid which would have burned the stomach in the manner discovered would have burned the mouth and throat. This phase of the question was in strict conformity with the testimony.

The assumption in the question with reference to paralysis is not very precise, but, under the circumstances, we deem it not prejudicial. In much of the medical testimony the symptoms of the three boys were dealt with together. Their general symptoms were the same. There is no specific statement that Lloyd's legs were drawn; but Dr. Wall testified that Murrell's leg was drawn, and Dr. Ritter testified that Murrell had a sort of "paralysis in his legs." It was also testified that this condition was a symptom of arsenic poisoning. It was the composite afflictions accompanying the illness of the boys, rather than individualistic indications, that were of paramount importance. For this reason we consider that this point does not involve harmful error. The assumption as to paralysis does not appear in any other hypothetical question.

All instructions requested by the defendant were given by the court to the jury. In the petition for writ of error, a point was made that the court gave improper instructions at the instance of the state. This assignment has not been pressed nor has there been any effort to indicate the alleged erroneous features of the state's instructions. Our examination of the instructions does not disclose error.

Comment on the enormity of the offense here involved would serve no useful purpose. The matter was primarily and essentially for determination by a jury of the vicinage. Such jury discharged its duty under oath.

The conclusion reached was warranted by the evidence, in our opinion, and, in so finding, we have necessarily disposed of the defendant's main reliance, namely, that the evidence does not support the verdict. The other points of error mentioned, though not much relied on when the case was submitted here for decision, we have, nevertheless, carefully examined. We find the record free of prejudicial error. It follows that the judgment must be affirmed.

*Affirmed.*