Harold Lloyd **RIFFLE** and Michael Douglas Shaffer, Petitioners,

v.

Frank B. **KING,** Warden of the West Virginia Medium Security Prison, Respondent.

Civ. A. No. C–68–158–E.

United States District Court
N. D. West Virginia.

Aug. 8, 1969.

William Bruce Hoff, Parkersburg, W. Va., for petitioners.

C. Donald Robertson, Atty. Gen. of West Virginia, Morton I. Taber, Asst. Atty. Gen., Charleston, W.Va., for respondent.

## MEMORANDUM

MAXWELL, Chief Judge.

Petitioners, Harold Lloyd Riffle and Michael Douglas Shaffer, were tried before a jury in the Circuit Court of Wood County, West Virginia, found guilty of murder in the first degree, and, on January 6, 1964, sentenced to confinement for life in the penitentiary.[1] Pursuant to this conviction Petitioners are now incarcerated in the West Virginia Medium Security Prison at Huttonsville, West Virginia.

After having exhausted their state remedies through timely applications for a writ of error and for a writ of habeas corpus, both of which were denied, Petitioners applied for a federal habeas corpus pursuant to 28 U.S.C.A. §§ 2241 et seq. On February 4, 1969, this Court heard oral argument by counsel for Petitioners and for Respondent.

The single issue raised by Petitioners in this application for federal habeas corpus is "that their first degree murder conviction, and resultant imprisonment, violate the due process clause of the Fourteenth Amendment, and the prohibition of involuntary servitude of the Thirteenth Amendment, to the Constitution of the United States because at their trial there was no evidence (not merely an insufficiency of evidence but no evidence), of the second and most important element of the corpus delicti in homicide cases, that is, that decedent's death was caused by criminal agency." This succinct statement is raised verbatim from Petitioners' brief to this Court and is employed because it clearly and concisely states the total position of Petitioners.

In reaching this contention all parties were in accord that the genuine issue was fully developed in the state trial court record and this record should be the basis of this Court's federal habeas corpus determination. 28 U.S.C.A. § 2247.

Under West Virginia law, the corpus delicti in criminal homicide cases consists of proof of (1) a death and (2) that the death was caused by criminal agency. State v. Stevenson, 147 W.Va. 211, 127 S.E.2d 638 (1962), cert. denied as Stevenson v. West Virginia, 372 U.S. 938, 83 S.Ct. 886, 9 L.Ed.2d 768 (1963). Petitioners agree that the death in issue resulted from suffocation or asphyxiation but argue that the state did not in-

---

1. Petitioners were prosecuted and convicted under West Virginia's felony murder statute, W.Va.Code § 61-2-1 (Michie 1966), which provides that: "Murder * * * in the commission of, or attempt to commit, arson, rape, robbery or burglary, is murder of the first degree."

troduce any evidence to show that the suffocation or asphyxiation was caused by the requisite criminal agency.

■■ This Court has jurisdiction to review the evidence introduced at Petitioners' state court jury trial for the valid purpose of determining whether *any* evidence was introduced against Petitioners as to the charge of first degree murder under the felony murder statute, for a conviction "totally devoid of evidentiary support" constitutes a denial of due process as guaranteed by the Fourteenth Amendment. Thompson v. City of Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960). In particular, the judgment of conviction must be supported by some evidence as to each essential element of the offense in order to satisfy the due process requirement. Johnson v. Florida, 391 U.S. 596, 88 S. Ct. 1713, 20 L.Ed.2d 838 (1968). "Decision of this question turns not on the sufficiency of the evidence, but on whether this conviction rests upon any evidence at all." Thompson, *supra*, 362 U.S. at p. 199, 80 S.Ct. at p. 625.

A detailed examination of the state court record in this case shows that the element of criminal agency causing death is not totally devoid of evidentiary support. The relevant facts regarding the death of decedent are as follows.

Early in the morning of January 20, 1963, Petitioners were watched as they removed a man later identified as deceased from a hallway on Fourth Street in Parkersburg, West Virginia, and put him into a Buick automobile. The man was trying to pull away and called out, "Lady, help me," to a witness. Trial transcript p. 71. It was to this hallway that Petitioner Shaffer had earlier helped another man walk the deceased when he had been too intoxicated to leave an establishment known as the Cabana Club at closing time around 11:45 Saturday evening.

In the early morning hours of January 20, Petitioners were seen in the FOUW Club, also called the Hole. Although they had been in the Hole earlier and had then been well dressed, they were described as muddy upon their return to the Hole. Riffle was depicted as being without shoes. A customer at the Hole recalled that Riffle's shirt was either unbuttoned or torn. An employee of the Hole testified that Petitioners tried to cash a twenty dollar check, identified as one earlier in the possession of the deceased. During a conversation with the same employee, Riffle said "I beat up on some guy," and Shaffer added, "Yes, he wanted to pack mud in his face and I wouldn't let him." Trial transcript, p. 328. This employee further said he asked Petitioners to leave when Riffle got into an argument.

The owner of a billiard hall near the Hole saw Riffle some time after midnight when Riffle, dressed in muddy clothes, tried to cash the twenty dollar check. Riffle told him " * * * the check was good because he had to fight for it." Trial transcript, p. 348.

Later that same morning, some time around 4:00 a.m., both Petitioners were seen in a place called the Red Fox trying to sell two watches identified as having belonged to the decedent. In response to a question about where he had gotten the watches, Shaffer told a witness "he had rolled a man on South Side." Trial transcript, p. 435. These watches were subsequently disposed of when a friend drove Petitioners across Memorial Bridge and Shaffer threw them out of the car.

Around 5:30 a.m. on Sunday morning Riffle went to the apartment of a girl friend where Riffle told the two girls there "he had been in a fight with some guy," Trial transcript, p. 520, "that he had cut him on the face a few times," and "that Mike (Shaffer) had put dirt in his face," Trial transcript, p. 522, but that they hadn't hurt the man very badly.

On Monday one of the girls spoke with Petitioners by telephone. At that time "Mike (Shaffer) came to the phone and he said for me to just keep cool and

not tell anybody what Red (Riffle) had told me and he wouldn't—that they wouldn't let anybody know that they had told me." Trial transcript, pp. 526–527.

The witness who had driven Petitioners across Memorial Bridge saw Shaffer again on Monday afternoon. During a conversation "Mike made the statement that him and Riffle had got their story together and got it straight and for us not to say anything about it." Trial transcript, p. 471.

On Sunday afternoon, January 20, 1963, decedent's body was found in a playing field in Parkersburg, West Virginia. Petitioners' presence in the field was shown when the mud on the car, Riffle had been driving Saturday night and early Sunday morning, was identified as having come from that field. Petitioners themselves admitted being in the field with decedent, but they denied having killed him. In a statement to the police on January 22, 1963, which was admitted into evidence as Defendants' Exhibit No. 22, Shaffer said decedent was "(l)aying in the mud" when he and Riffle left the field. Trial transcript, p. 913.

The body was found lying on its right side in the mud. With the exception of the left side, the body was covered with mud. On the left side, only splotches of mud were seen. When found, decedent was wearing a two-piece union suit and a shirt. The top part of the union suit and the shirt were rolled up around his shoulders leaving the back exposed. The left leg of the bottom section of the union suit was ripped away and wadded under the body. Decedent's trousers were found depressed in a tire track about six feet nine inches from his head. The grass and weeds in the area around the body were trampled, and tire marks were seen within ten feet of the body. A muddy handkerchief was found about seven feet from decedent's head, and a whiskey bottle lay about twelve feet four inches from his feet.

The time of death, as testified to by the coroner, was between midnight and 6:00 a.m. of January 20, 1963. The cause of death, he stated, was suffocation. The conditions surrounding the death were not consistent with death from natural causes or exposure.

The pathologist who performed an autopsy upon the decedent found the face to have been covered with mud. Mud was in the ears, the nose, and under the eyelids. But no mud or foreign substance was present in decedent's mouth or throat. An examination of decedent's internal organs showed that decedent was not suffering from any organic disease which would have caused death. The examination did reveal congestion of various internal organs, small hemorrhages beneath the lungs, hemorrhagic inflamation of the stomach, and cyanosis of parts of the face, which findings are consistent with death from suffocation or asphyxiation. There was no evidence of carbon monoxide poisoning or of any external force being applied to decedent's throat.

Laboratory tests showed that decedent's blood contained .22 percent alcohol by weight. Such an amount of alcohol, the pathologist testified, would have a depressant effect upon a person's respiratory control center and could have made deceased less able to defend himself and more vulnerable to blows.

In order for a death or a homicide to constitute a criminal offense, the corpus delicti must be established as an essential element. State v. Stevenson, 147 W.Va. 211, 127 S.E.2d 638 (1962), cert. denied as Stevenson v. West Virginia, 372 U.S. 938, 83 S.Ct. 886, 9 L.Ed.2d 768 (1963).

"In State v. Beale, 104 W.Va. 617, 141 S.E. 7, 141 S.E. 401, this Court said that to constitute the corpus delicti in a case of homicide two fundamental facts must be established: (1) the death; and (2) the existence of criminal agency as the cause thereof." State v. Stevenson, *supra* at page 641.

Although the fact of death is generally established by the existence of the

body itself, as in the instant case, the existence of criminal agency as the cause of the death can be established by circumstantial evidence as well as by direct evidence. State v. Merrill, 72 W. Va. 500, 78 S.E. 699 (1913); State v. Flanagan, 26 W.Va. 116 (1885). "All that is required is that the evidence convince the jury beyond a reasonable doubt that the deceased came to his death by a criminal act." State v. Lucas, 103 W. Va. 743, 138 S.E. 393, 396 (1927).

The pathologist, who performed the autopsy upon the decedent in the instant case, testified at Petitioners' trial that:

In the absence of organic disease demonstrable by gross and microscopic study of the body, and with the presence of congestion that I have described in the internal organs, the cyanosis of the lower half of the face and neck, and the petechial hemorrhages, particularly under the eyelids, my medical opinion is that this individual died of asphyxiation. Trial transcript, p. 275.

The witness described in detail the findings upon which he based this conclusion, but was unable to identify the cause of the asphyxiation. He found no mud in the deceased's mouth or throat and found no indication that a rope had constricted the neck. He did state that much of the body, especially the face, was covered with mud, that he observed superficial scratches and bruises on various parts of the body including "multiple abrasions and contusions of the facial area," Trial transcript, p. 257, but that the force of any blow could not be determined from the superficial injuries present. Further medical testimony explained that alcoholic intoxication "can depress (a person's) reflexes so that his ability to defend himself against such blows is impaired, and thrusting depressing action on such vital centers as the respiratory center can make him more vulnerable to serious results from the effect of the blows." Trial transcript, p. 262.

The pathologist further testified that, given the findings of cyanosis, hemorrhage and congestion, there ordinarily would be evidence of organic disease if the death resulted from natural causes.

■ This testimony, argue Petitioners, shows that there is no evidence as to any criminal agency causing death. However, proof of the cause of death is not limited to facts learned from the autopsy. See State v. Lucas, 103 W.Va. 743, 138 S.E. 393 (1927). The testimony of the pathologist raises questions regarding the cause of death by pointing out the absence of organic disease which could have caused death and by explaining the effect of intoxication upon a person's respiratory system. Although the testimony does not positively show that death resulted from foul play, it does not exclude such a possibility. In addition to the testimony of the pathologist, there is the testimony of the coroner, who saw the body in the field and was present during the autopsy, to the effect that the conditions he observed were consistent with death from suffocation but not consistent with death from natural causes or exposure.

Because circumstantial evidence is admissible under West Virginia law to show that death resulted from criminal agency, this Court is able to review the circumstances surrounding the death as well as the medical testimony regarding the cause of death in order to determine whether *any* evidence was presented regarding the essential elements of the corpus delicti. State v. Lucas, 103 W. Va. 743, 138 S.E. 393 (1927).

Evidence has been introduced in this case to support the hypothesis that decedent's suffocation was caused by criminal agency. The trampled grass and weeds around the body; the disheveled appearance of the body with the trousers missing and the underwear torn; the absence of mud in decedent's mouth when mud was found in his eyes, ears, and nose, considered with the fact that a muddy handkerchief was found

nearby; the muddy and disheveled appearance of Petitioners who had been in the field with the decedent; and the statements of Petitioners about fighting with a man and "rolling" a man easily lead to the conclusion that violence or force was exerted against the decedent. See State v. Koontz, 117 W.Va. 35, 183 S.E. 680 (1936); State v. Dudley, 96 W.Va. 481, 123 S.E. 241 (1924).

In addition to the evidence of force having been exerted against the deceased we have the medical testimony that the extent of any force used against deceased could not be accurately measured and that intoxication would make him more vulnerable to foul play. A pre-existing physical condition, rendering the deceased unable to withstand the shock or effect of an otherwise non-fatal blow or wound, does not prevent the attachment of criminal responsibility to the rendering of a subjectively fatal blow or wound. Also, if a blow or wound brings about an affliction or disease resulting in death, criminal responsibility attaches. 40 Am.Jur.2d *Homicide* § 20, page 313.

> The law does not require direct proof of the killing, nor prescribe any positive or exclusive mode of proof, but admits individual or presumptive evidence to prove the crime, with the admonitory caution, however, that it must be weighed with scrupulous circumspection. It may be proved either by direct proof or by strong and unequivocal circumstances which render its commission morally certain. State v. Beale, 104 W.Va. 617, 141 S.E. 7, 13, 141 S.E. 401 (1927).

 Whether the evidence in this case is sufficient to satisfy the West Virginia requirement that the corpus delicti be established by full proof or beyond a reasonable doubt is a question beyond the permissible scope of federal habeas corpus review of the state court conviction. As the United States Court of Appeals for the Fourth Circuit said in Grundler v. State of North Carolina,

283 F.2d 798, 801 (4th Cir. 1960), cert. denied 362 U.S. 917, 80 S.Ct. 670, 4 L. Ed.2d 738 (1960):

> There is a difference between a conviction based upon evidence deemed insufficient as a matter of state criminal law, and one so totally devoid of evidentiary support as to raise a due process issue. It is only in the latter situation that there has been a violation of the Fourteenth Amendment, affording the state prisoner a remedy in a federal court on a writ of habeas corpus.

Accord, Young v. Boles, 343 F.2d 136 (4th Cir. 1965). Only where the proof offered is so "pretensive or otherwise so hollow as to establish only a spectre of crime," Young v. Boles, *supra* at page 138, is the conviction a constitutional nullity. Such is not the case here.

 The evidence here, summarized, shows that force was used against the decedent, that his intoxicated condition would make him particularly vulnerable to any force, and that he was found dead in the place where the force was applied. Such evidence, and the reasonable inferences drawn therefrom, Harrison v. Boles, 307 F.2d 928 (4th Cir. 1962), presents some evidence of the criminal causality element of the corpus delicti. Such evidence is sufficient to satisfy the standard set forth in Thompson v. City of Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960), and Johnson v. Florida, 391 U.S. 596, 88 S.Ct. 1713, 20 L.Ed.2d 838 (1968).

Because evidence was presented during Petitioners' trial to show that the death in issue resulted from criminal agency, this Court concludes that Petitioners were not denied due process of law under the Fourteenth Amendment when they were convicted. In addition, a constitutionally valid conviction does not violate the Thirteenth Amendment prohibition against involuntary servitude when the conviction is based upon evidence of the offense. United States ex rel. Caminito v. Murphy, 222 F.2d

698 (2nd Cir. 1955), cert. denied, Murphy v. United States ex rel. Caminita, 350 U. S. 896, 76 S.Ct. 155, 100 L.Ed. 788 (1955).

An order will be entered denying the relief sought and dismissing Petitioners' application.