STATE OF WEST VIRGINIA

*v.*

KATHERINE VIRGINIA DURHAM

(No. 13233)

Submitted January 16, 1973.　　　Decided March 13, 1973.

*Jones, Williams, West & Jones, Jerald E. Jones*, for plaintiff in error.

*Chauncey H. Browning, Jr.*, Attorney General, *George E. Lantz*, Deputy Attorney General, *Richard E. Hardison, E. Leslie Hoffman, III*, Assistant Attorneys General, for defendant in error.

SPROUSE, JUDGE:

This criminal case is before the Court on a writ of error and supersedeas granted to the final judgment of the Circuit Court of Doddridge County entered on December 16, 1971, by which judgment that court sentenced Katherine Virginia Durham to confinement in the West Virginia Penitentiary for Women for a term of not less than one year nor more than five years. The sentence was imposed upon a jury verdict finding her guilty of voluntary manslaughter pursuant to an indictment charging her with the murder of Franklin Calvin Durham.

The sole issue relied upon by the defendant is that the State failed to prove the corpus delicti. The issue was properly raised at the trial. The defendant's contention is that the medical and other evidence did not establish that the wound inflicted by the defendant caused the death of her husband. Since this is essentially an evidentiary determination, it is necessary to look at the evidence of the case in some detail.

The defendant, Katherine Virginia Durham, was married to the deceased, Franklin Calvin Durham, at the time she shot him. The Durhams, at the time of the incidents leading to the death of the deceased, lived together "at the foot of Tar Kiln", a rural area in Doddridge County, but they had been having domestic difficulty for several months. The defendant, the proprietor of a beer tavern, had been previously married. The deceased had been unemployed for some time, and apparently spent most of his time, when not helping at the tavern, visiting other taverns and places of entertainment and frequently indulging in the liquid refreshments offered by those establishments.

The deceased and a companion were engaged in this kind of activity the night preceding the shooting, and the deceased was involved in other difficulty involving the defendant wife, which is not important for the purpose of this decision. The details concerning the deceased's entry into his home and the consequent shooting by his

wife, are likewise not decisive in this case inasmuch as her act of shooting is admitted and her defense of accidental shooting was obviously not accepted by the jury who found her guilty of voluntary manslaughter. It is sufficient to state that the deceased at about 8:30 or 9:00 o'clock on the morning of March 21, 1971, entered through the front door of their house, and within seconds he was shot in the abdomen by a bullet fired from a .22 caliber pistol, which Mrs. Durham had inherited from her first husband.

The deceased, who was lying on the floor, apparently comfortable, at the time the sheriff and the ambulance arrived, was taken at his request to St. Mary's Hospital in Clarksburg. There he was seen in the emergency room at 9:55 a.m. on March 21, 1971 by Dr. Walter E. Williamson, Jr., a surgeon of Clarksburg, who had been called to the emergency room to treat him. The doctor was present in the emergency room when the victim arrived.

Dr. Williamson's examination revealed a gunshot wound in the upper abdomen, on the upper side. From his examination, the doctor determined that the deceased's condition was satisfactory. "The vital sounds were all right."

The entrance wound of the bullet was in the "right upper costal margin, three inches below that and two inches to the right of the midline." The exit wound was in the right flank, one inch to the right of the midline and two inches above the iliac crest. Dr. Williamson indicated that the bullet passed through the deceased's body in a straight line and no vital organs were punctured or hit. The bullet which passed through the victim was found in his clothing. The doctor asked the deceased some questions concerning his medical history, and he mentioned no previous serious illness or injuries. The deceased later revealed to the doctor that he had been drinking quite a bit before the injury.

The victim died at 6:00 o'clock a.m. on March 22, 1971, the day following the shooting. In the interim, Dr. Williamson had performed surgery on the victim, describing his procedures as normal and necessary for this type of wound. The only injury found during the surgery was a "laceration of the mesentery of the bowel, which are the supporting tissues holding the bowel in place, and a hematoma was present in this mesentery which contained several hundred cc's of blood." The operation took one hour and twenty minutes. The doctor indicated that either the anesthetic fluothane, N20 or Nitrous oxide, succinyl choline or surital, one or the other was administered, but he did not know which. He also ordered medication consisting of seconal, numorphan and atropine, which he described as usual pre-operative medications. Later, the patient was given ampicillin, an antibiotic, intravenous fluids, aspirin, thorazine and nasal oxygen.

After the operation, the doctor saw the patient at 5:30 p.m. the day of the operation, and his condition was good. He saw him again at 4:15 a.m. the next morning, and his condition had deteriorated drastically. The doctor did not see him again, and the patient expired at 6:00 o'clock a.m.

It is undisputed that the defendant wounded the deceased with a .22 caliber bullet, that he was immediately taken to the hospital and that although the wound was of a minor nature, an operation was necessary to clean the wound and repair any damage in the area of the injury. No vital organ was damaged by the wounding, but there was medical testimony that the deceased had a pre-existing condition of a diseased or "fatty" liver. The deceased died in the hospital approximately 22 hours after receiving the wound, and an autopsy was performed. Although their testimony was not fully developed, Dr. Williamson, the surgeon, and Dr. Fischer, the pathologist who conducted the autopsy, testified concerning the cause of death.

Dr. Williamson gave the following pertinent testimony:

"Q. Doctor, was an operation necessary?

"A. Yes sir, any penetrating wound of the abdomen must be explored * * *."

* * *

"Q. Did your primary examination reveal any condition that would of and in itself cause death, excluding the gunshot wound?

"A. None that I am aware of."

* * *

"Q. * * * what outside of the medication and treatment which was administered * * * contributed to this man's death?

"A. His obesity may have contributed to it, his fatty liver that he had secondary to drinking may have contributed to it."

Dr. Fischer, the pathologist, testified in pertinent part as follows:

"A. * * * The only disease we found were those of the liver and the lungs. The liver showed a fatty type degeneration that can be caused by many diverse conditions. The lungs showed edema and congestion and showed a lot of fluid and blood in the lungs.

(The pathologist in later testimony excluded the condition of the lungs as a contributing factor to the death.)

"Q. What * * * was the seriousness of the wound * * * ?

"A. It was not serious.

"Q. Would the man have survived from the wound had no operation been performed?

"A. Probably, I couldn't say for certain."

* * *

"Q. What, primarily, did you attribute to the cause of death itself * * * ? ,

"A. Of course, I am not an expert witness, I don't believe, but if I were to pick a cause of death, I would say a hepatitic liver in origin."

\* \* \*

"Q. Could you clarify \* \* \* ?

"A. He had a fatty damaged liver and just about any kind of drug could trigger the liver causing hepatitic death.

"Q. How long does it take such a condition of the liver to evolve?

"A. \* \* \* it can happen in hours or it can happen in weeks.

"Q. Was the condition of the liver you found in his body an old condition or new condition \* \* \* ?

"A. I would say probably fairly old."

\* \* \*

"Q. Doctor, \* \* \* what in your opinion would have been the ultimate result of his condition had no operation been performed?

"A. An awful lot really does depend on the past history. \* \* \* I have to get all of this knowledge and put it together."

The pathologist was then read a list of drugs which had been administered to the deceased after his operation and asked if they would qualify as chemical agents such as could have triggered the hepatitic death, and the pathologist testified that any of them would qualify as such chemical agent. The pathologist indicated that the autopsy in this case "is not too helpful in establishing the cause of death." Doctor Fischer testified that the fatty changes in the liver probably were not severe enough in themselves to cause death. He testified, however, that, "On the other hand, a fatty liver subjected to other trauma or chemical agents such as barbituates or

hypnotics or other chemical agents has been shown to have precipitated death."

Dr. Fischer further testified as follows:

"Q. If these chemical agents were present it could have been the death of Franklin Durham?

"A. Yes.

"Q. But you don't know whether they were or not?

"A. No, sir."

(The blood analysis Doctor Fischer sent to the laboratory had been misplaced by the laboratory.)

The pathologist also testified that the "anesthetic itself might have acted as the chemical agent which was the precipitant cause of death from his fatty liver. There is a lot of argument about that * * * ."

The law in practically every American jurisdiction, including West Virginia, is that the corpus delicti in cases of felonious homicide consists of two basic elements: (1) Death of the victim; and (2) the existence of a criminal agency as a cause thereof. 40 C.J.S., *Homicide*, Section 186, page 1086-87; 40 AM. JUR. 2d, *Homicide*, Section 4, page 297; *State v. Craig,* 131 W.Va. 714, 51 S.E.2d 283; *State v. Koontz,* 117 W.Va. 35, 183 S.E. 680; *State v. Beale,* 104 W.Va. 617, pt. 6 syl., 141 S.E. 401. Most of the cases decided in West Virginia concerning the proof of the corpus delicti relate to establishing the death of the victim or to the existence of a criminal agency. *State v. Craig,* 131 W.Va. 714, 51 S.E.2d 283; *State v. Koontz,* 117 W.Va. 35, 183 S.E. 680; *State v. Lucas,* 103 W.Va. 743, 138 S.E. 393; *State v. Gilfillen,* 96 W.Va. 660, 123 S.E. 578; *State v. Roush,* 95 W.Va. 132, 120 S.E. 304; *State v. Merrill,* 72 W.Va. 500, 78 S.E. 699; *State v. Flanagan,* 26 W.Va. 116.

In the case we are now considering, there can be no doubt that Mr. Durham is dead, nor of the criminal agency of Mrs. Durham. We must decide only part of the second element of the corpus delicti, or actually one that might

be viewed as a third element, that is, causation. Did the criminal agency of Mrs. Durham cause the death of her husband in such a way as to make her criminally responsible?

There are no decided cases in this jurisdiction on the question of whether an inflicted wound is the criminal cause of death where the wound would not have caused death but for pre-existing physical disability and/or subsequent treatment.

In *State v. Roush, supra,* the defendant and the deceased were mutually engaged in two or three days of friendly social activity, at the conclusion of which the defendant, a very small man, hit the decedent, a very large man physically, and the latter died upon hitting the pavement. There was testimony that the blow was struck in a joking manner. The autopsy showed two small bruises at the base of the skull, but there was no testimony as to their possible pre-existence, nor of causation. This Court said that the evidence of defendant's agency in the commission of the crime must be so clear and convincing as to exclude any reasonable hypothesis of other causes. The Court also held, under the facts of that case, that the lay testimony and medical testimony together were not sufficient to meet the requirements for proving causation, and that the proof of the corpus delicti failed.

In *State v. Lucas, supra,* the defendant, a 25-year old ex-boxer, struck a 73-year old man who died shortly thereafter. The conviction of second degree murder was affirmed. The medical evidence relating to the cause of death was not certain. One doctor testified that a man of deceased's age was more likely to have hardening of the arteries or die of apoplexy, than a man under 50, but no autopsy had been performed. The Court held that, "While our cases hold that both the *corpus delicti,* or criminal act, and the agency of the accused in such act must be proved before the jury beyond a reasonable doubt, * * * yet the *corpus delicti* may be proved by

circumstantial evidence." *State v. Lucas, supra* at 751-52, 138 S.E. at 396.

In *State v. Craig, supra,* a voluntary manslaughter conviction was reversed. The deceased was struck by an automobile and sustained bruises on his right hip and a slight fracture of the pelvis. In addition, he was found to be anemic. About three days after the accident, he developed paralysis of the bowels, and, about 48 hours later, he contracted pneumonia and died. The Court said unless the proof is sufficient to establish beyond a reasonable doubt that the act of an accused caused the death of another person, a verdict which convicts him of the crime of manslaughter will not stand.

The *Roush, Lucas* and *Craig* cases are our only reported cases dealing with the causation as part of the corpus delicti in a felonious homicide case. None of them deals specifically with a pre-existing condition and treatment. There are, however, a host of cases in other jurisdictions deciding similar questions. See Annot., 100 A.L.R.2d 769, 780; *People v. Nerida,* 29 Cal. App. 2d 11, 83 P.2d 964; *Quillen v. State,* 49 Del. 114, 110 A.2d 445; *State v. Cox,* 82 Idaho 150, 351 P.2d 452; *DeVaughn v. State,* 232 Md. 447, 194 A.2d 109; *State v. Medlin,* 355 Mo. 564, 197 S.W.2d 626; *Commonwealth v. Haley,* 359 Pa. 477, 59 A.2d 62; *Waller v. Commonwealth,* 178 Va. 294, 16 S.E.2d 608; *People v. Parody,* 248 App. Div. 269, 289 N.Y.S. 929.

In *People v. Nerida, supra,* a conviction was upheld where the victim, who had been stabbed, died of an infection after an exploratory operation. The Delaware court upheld a conviction in *Quillen v. State, supra,* where an embolism was the immediate cause of death, the embolism being caused either by a gunshot wound or by a skin graft operation. In *State v. Cox, supra,* a conviction was upheld where the deceased died of shock induced from the administration of anesthetic after an automobile collision. The court in *DeVaughn v. State, supra,* upheld a conviction where the deceased died twenty-three days after the shooting due to an infection which developed

after an operation. *State v. Medlin, supra,* is another case where the immediate cause of death of the victim was shock caused by the injury and subsequent surgery. In *Waller v. Commonwealth, supra,* the victim died of a collapsed lung two days after the infliction of bullet wounds. The medical evidence revealed that the pulmonary collapse was unrelated to the major wound, but that it was a condition which followed a certain percentage of operations. In *State v. Richardson,* 197 Wash. 157, 84 P.2d 699, the crime resulted in second degree burns and the victim died four days later of bronchial pneumonia. The medical testimony revealed that in burn cases the most frequent cause of death in bronchial pneumonia. The court held there was sufficient evidence of causation. In *People v. Parody, supre,* a manslaughter victim underwent a bone graft operation, not to save her life, but to assist her to walk. She died as a result of the operation, and the conviction of the accused was affirmed.

It is, of course, not indispensable to a conviction for murder that the wounds be the direct cause of death. It is sufficient if the initial wound caused the death indirectly through a chain of natural causes. Text writers in general take a uniform position on the effect of a pre-existing physical condition.

> "It is equally well settled that the consequences of an act which is the efficient cause of the death of another are not excused, nor is the criminal responsibility for causing death lessened, by the pre-existing physical condition of the person killed * * * which rendered him unable to withstand the shock of the wound inflicted, and without which predisposed condition the blow would not have been fatal * * * ." 40 AM. JUR. 2d, *Homicide,* Section 20, page 313.

It is immaterial that the accused did not know that the deceased was in a feeble condition which facilitated the killing. "Responsibility for homicide attaches to one who accelerates the death of a person in poor physical condition * * * ." 40 C.J.S., *Homicide* Section 11 (d), page

855. See also 40 AM. JUR. 2d, *Homicide,* Sections 15-16, pages 306-07.

It is also clear that foreseeability is not an element in the corpus delicti. Causation, as we consider it here, is not the type of causation involved in tort liability. It is not necessary that the defendant could have reasonably anticipated that her act would cause death. 40 C.J.S., *Homicide,* Section 11 (d), page 856.

As can be gleaned from this discussion, the great weight of authority in this country holds a defendant criminally responsible where he inflicts a wound resulting in death, even though the cause of death is related to the proper treatment of the wound or such treatment or effect of a pre-existing physical disability of the victim. We hold this to be the law of this State governing this case.

To hold, however, that the defendant in this case was responsible, we must find that the corpus delicti was established by direct evidence or by cogent and irresistible grounds of presumption and that such death was not due to natural or other causes in which the accused did not participate. *State v. Roush,* 95 W.Va. 132, 120 S.E. 304; *State v. Merrill,* 72 W.Va. 500, 78 S.E. 699.

The death of the victim must be proved by direct testimony or by presumptive evidence of the strongest kind, but the existence of a criminal agency as the cause thereof, can be established by circumstantial evidence and presumptive reasoning from the facts and circumstances of the case. *State v. Beale,* 104 W.Va. 617, 141 S.E. 401; *State v. Merrill, supra; State v. Flanagan,* 26 W.Va. 116.

In the instant case, there is little direct evidence that the flight of the bullet initiated by Mrs. Durham was the immediate cause of her husband's death. The testimony of the treating physician and the pathologist is the only medical evidence, and it is not in conflict. Taken together, the medical evidence reveals that the bullet wound by itself would not have caused the death. The operation was of a relatively minor nature. The

direct cause of the decedent's death was the fatty liver condition, and the death was either accelerated or triggered by the administration of the anesthesia or another chemical agent, such as that administered by Dr. Williamson, or by the trauma caused by the bullet. Neither of the doctors could say with certainty that either of these was the causative factor, but testified to the probability that one or the other triggered or accelerated the death.

That the deceased was shot by the defendant, was taken immediately to St. Mary's Hospital, was operated on for the wound caused by the bullet, and died approximately 22 hours later, is all circumstantial evidence relating to the cause of death.

The trial court by Defendant's Instructions Nos. 14, 15, 16 and 17, properly instructed the jury that the State must prove beyond a reasonable doubt that the defendant's act was the actual cause of his death, and that a reasonable doubt as to such causation would prohibit a conviction.

An appellate court is limited in reviewing the evidence to the inquiry whether competent evidence to sustain the conviction was properly presented to the jury. *State v. Beale, supra.* In the instant case, the medical testimony can be characterized at least as circumstantial evidence relating to the cause of the death. The non-medical, circumstantial evidence on the question of causation was likewise properly presented to the jury. The jury thus properly instructed had for its consideration direct and conclusive evidence of the death and competent circumstantial evidence that the defendant's criminal agency caused the death. They found the gunshot wound she inflicted on her husband was the cause of her husband's death. We cannot say the jury was wrong.

For reasons stated in this opinion, the judgment of the Circuit Court of Doddridge County is, therefore, affirmed.

*Affirmed.*