# CHARLESTON.

## STATE *v.* MERRILL.

Submitted, April 25, 1913. Decided May 13, 1913.

1. HOMICIDE—*Evidence—Corpus Delicti.*

     Upon an indictment for murder, (in this case infanticide) before a conviction can be had, or the accused can be required to answer, the *corpus delicti* must be satisfactorily proved either by direct evidence or by cogent and irresistible grounds of presumption, and that such death was not due to natural or other causes in which the accused did not participate. (p. 504).

2. SAME—*Evidence—Sufficiency.*

     A case in which the evidence was not sufficient to establish the fact of the crime charged, and to justify the verdict and judgment of conviction. (p. 506).

Error to Circuit Court, Tucker County.

Ona Merrill was convicted of voluntary manslaughter, and brings error.

*Reversed and New Trial Granted.*

*C. O. Strieby* and *Cunningham & Stallings,* for plaintiff in error.

*A. A. Lilly,* Attorney General, and *John B. Morrison,* Assistant Attorney General, for the State.

MILLER, JUDGE:

Upon an indictment for the murder of an infant child, born out of wedlock, by defendant, its grandmother, the jury found her guilty of voluntary manslaughter, and the judgment of conviction thereon was that she be confined in the penitentiary for not less than one nor more than five years.

The one question, presented in numerous ways, is, was the *corpus delicti* established justifying the verdict and judgment, which depended solely on circumstantial evidence?

The mother of the child was defendant's daughter, a girl of less than sixteen years. To establish the fact or body of the crime the State rested its case mainly on the testimony of a young physician, temporarily at the place of the birth, and according to his own statement, of but two years experience, to

the effect that before the birth of the child defendant stated to him that her daughter had been sick several times and had never complained or felt the movements of the child and gave it as her opinion that the child was probably not living, but if living, very weak, and if so she recommended that he make no effort to revive it; that it would be a good thing to take it to the home of another daughter, who had a nursing child—to lose it; that after its birth defendant threw a blanket over it, and when told by him that she should not do that, she answered, that there were people in the house, and what should she do, to which he answered, have them removed, which she did; that it was agreed between them, mother and grandmother, that the child should be so taken, and that defendant took the child, and after being gone some fifteen or twenty minutes she returned very much excited, saying she had run the whole way; that same evening he visited the mother, and on inquiry defendant said the baby was fine; that the next morning he went first to the home of the other daughter to inquire about the child, did not see it, and from there drove directly to defendant's house, where he saw her and inquired of her about the child, and who said the child was doing well; later defendant said an uncle had come and taken the child to Baltimore.

In addition, this witness testified that about six days after the child's birth, he gave notice to the public authorities, who visited the premises, and in a short time found the child dead and buried under a stable in the back yard, and that he next saw the child after it was found at the coroner's inquest, and identified it as the child of which he had delivered defendant's daughter, principally by the string tied on it by him at its birth. On cross-examination he admitted knowing that several doses of morphine had been administered to the mother by another doctor, shortly before he took charge of the case; that her appearance was that she had a good dose, and that he had himself administered a dose; and he gave it as his opinion that this drug would have had no effect on the child, but admitted that when the child came it was in a very low state of vitality, but after fifteen or twenty minutes it breathed and cried, that its skin was more dark than normal, darker than the average child, the reason for which he did not know; later he denied having said the child was in a low state of vitality, but had said it didn't

breathe at first. While denying that it was done upon or on his suggestion, he admits that it was customary with Catholics, when a child is born like this one, to baptize it, and that when defendant, as he claims, administered baptism he held the child for her and made no objection to it.

And being recalled, and interrogated with reference to what he saw and did after the child was found and taken to the un- dertakers, where he first saw it, he said the child was as it was exhibited in the court room at the trial, except it had more clothes on it, that at first the clothes were loosened, and every- thing removed except the cloth on the body and the one that come down over its face, that he examined the shoe string tied around the neck on the outside of the coverings, and gave it as his opinion that it was tied tight enough to choke it. "Q. Would you say it would or did choke it? A. Yes sir. Q. How would it suffocate it? A. By the cloth." And being again cross examined he testified as follows: "Q. Doctor when you spoke of the cloth having been drawn tightly over the child's face, you don't mean to say by an external examination or look at the child that you could tell whether it was dead be- fore that cloth was tied over it? A. I removed the cloth at that time from the face, but not the string around the throat, but I didn't untie the string. Q. You don't mean to say you could tell if it had been dead before or whether it died from the string tied around its neck, or the cloth drawn over its face? A. No one could tell that."

The only other evidence offered by the State was the testi- mony of McVeigh and Williams, town sergeant and assistant, and Dunkin, the undertaker, relating to the finding of the child, its condition when found, particularly as to how it was wrap- ped, and the string about its neck. As to the string around its neck the undertaker said it was drawn he thought very tight. McVeigh, the town sergeant, said, respecting the finding of the body and its condition when found: "It was wrapped in a piece of muslin, and then wrapped in a piece of ticking. * * * There was a piece of muslin or pillow slip or something of that kind pulled down over its head and wrapped around the neck two or three times with a shoe string; then there was a shoe string wrapped three times around the neck and tied, then that one end of the muslin or pillow slip was brought around the

body and pinned with a safety pin and then it was wrapped in a piece of bed ticking, three pieces wrapped around the neck and tied." He further says, that when they tore the rag off of the face he "noticed that the nose was pressed down flat."

The record shows there was a coroner's inquest, but the result of that inquest or what took place, and the scope of the investigation is not disclosed. The record is silent as to whether a post mortem examination of the body was had. There were doctors and at least one hospital at the place of the birth and death of the child. No marks of violence on the body are shown, from which death could have resulted. The State relied solely on the theory of suffocation or strangulation, due to the coverings over or the string found tied around the neck, and yet showed none of the general evidences of death by strangulation or suffocation, which scientific investigation or even common observation usually disclose. Books on medical jurisprudence are replete with information on this important subject, for the guidance of court and counsel. See 3 Wharton & Stille, Med. Jur. 79-96, on the subject, "Infanticide"— "Death after Labor"; also the chapter on "Strangulation", in the same volume, beginning at page 311. Why was this important phase of the case neglected? There was no evidence even of the most superficial signs of strangulation or suffocation, which the books say are usually present. It is unnecessary to repeat here what the books say on this subject, it suffices to refer to the books, and to say that in this case no attention appears to have been given to it on the trial.

Of course we do not mean to intimate that conviction would not be justified without the application of all the scientific tests referred to in the books. It is probably true that competent experts could not have been found in the community where this case originated and was tried, but if the books speak truly, many of these evidences are apparent to any one, not requiring much, if any, scientific knowledge.

Shall courts and juries allow those accused to go to prison on bare suspicion of motive or circumstance when more unerring evidences of crime if any are at hand and either neglected or suppressed? As applicable to this case we think it should be so. Witnesses for defendant, two daughters, a servant girl, and two physicians gave evidence, which, if true, tended

strongly to exculpate defendant from guilt, or to show that the death of the infant was or may have been due to the poisonous drugs administered to the mother, or to natural causes. The mother of the child, for instance, swore that soon after its birth, when no one else was in the room, she got up, and found the child dead, and herself wrapped it up and put it in her trunk, to hide it from view, until she could put it away, and that she and not her mother, had prepared it and buried it temporarily under the stable where it was found. She goes into rather minute details on this subject, and explains conflicting stories told, and imputes some of them to agreements with the doctor, whose testimony is relied on by the state.

Of course where there is conflict, the jury are the judges, and the court cannot properly invade their province. But independently of any conflict in the evidence, the question going to the very foundation of the prosecution is, has the State established by *competent* proof the fact of the crime charged? After consideration of all the evidence and the authorities bearing on the subject we do not think it has done so. True many suspicious facts and circumstances are shown. But suspicion alone will not do. That the body of the little one was laid away as it was, is, under the facts and circumstances of its birth, reconcilable as well on the theory of innocence as of guilt of the accused, and so are most if not all other suspicious facts and circumstances. The books all say that before inquiry as to the guilty agent should be entered upon the fact that a crime has been committed should be established by proof. In our case of *State* v. *Flanagan,* 26 W. Va. 116, a leading and well considered case, point 6 of the syllabus states the rule thus: "It is a fundamental and inflexible rule of legal procedure, of universal obligation, that no person shall be required to answer or be involved in the consequences of guilt without satisfactory proof of the *corpus delicti* either by direct evidence or by cogent and irresistible grounds of presumption." *State* v. *Parsons,* 39 W. Va. 464, 19 S. E. 876, says: "Both the *corpus delicti,* or criminal act, and the agency of the accused in such act, must be proven before the jury beyond a reasonable doubt." In the Flanagan case, at page 123, Judge SNYDER says: "While the discovery of the body necessarily affords the best evidence of the fact of the death, and the identity of the individual, and

more frequently also, the cause of the death, yet in such cases
the *corpus delicti* can not be said to be proved until it be fully
and satisfactorily proved that such death was not caused by nat-
ural causes, accident, or by the act of the deceased." Other
cases laying down or recognizing the same rules are, *Brown* v.
*Commonwealth,* 89 Va. 379, 16 S. E. 250; *Goldman* v. *Com-
monwealth,* 100 Va. 865, 42 S. E. 923; *McBride* v. *Common-
wealth,* 95 Va. 826, 30 S. E. 457; *Smith* v. *Commonwealth,* 21
Grat. 820. But why multiply citations? It is universal law.

As illustrations of the rule respecting the proof of the fact
of the crime, and fastening it on the accused, counsel have re-
ferred us to the following cases. *People* v. *Palmer,* 109 N. Y.
110, 4 Am. St. Rep. 423; *State* v. *Williams,* 7 Jones Law 446,
(N. C.) 78 Am. Dec. 248-257; *Hatchett* v. *Com.,* 76 Va. 1026;
*Harris* v. *State,* 28 Tex. App. 308, 19 Am. St. Rep. 837; *In re
Davis,* 3 City H. Rec. (N. Y.) 45; *Lee* v. *State,* 76 Ga. 498; *Jo-
sef* v. *State,* 34 Tex. Cr. Rep. 446, 30 S. W. 1067. In the Vir-
ginia case cited defendant was indicted for poisoning Y. There
was no post mortem examination, and no analysis of the con-
tents of the stomach, or of the vessel which contained the li-
quor administered, and which was said to contain poison. The
accused administered the liquor, but there was no proof that he
knew it contained poison, if it did contain poison, nor was any
motive or provocation shown. Held, that a verdict of guilty
would be set aside, and a new trial granted. In the Georgia
case, on the trial of an indictment for murder it was proved that
the defendant had been delivered of a child, which was found
some distance from her house, and was returned to her in a
healthy condition. The next morning it was dead. A physi-
cian testified that there were no marks of violence upon the
child, and that he did not know whether it had died from ex-
posure or been smothered. It was there held that the evidence
was insufficient to warrant a verdict of guilty. In the Texas
case of *Josef* v. *State,* it is said: "On a prosecution for in-
fanticide, there was evidence that the infant was found dead in
a cistern, near a house in which defendant and a woman occu-
pied a single room prior to and at the time of the murder; that
when officers, with a physician, came to the house, four days
after the murder, defendant objected to their entering; that
previous to the examination of the woman, to which the defend-

ant strenuously objected, to determine whether she had been recently confined, defendant denied any knowledge of the fact of her confinement; and that a cord around the infant's neck was tightly drawn, which physicians testified might have caused death by strangulation. Physicians testified from an examination of the corpse that the child was born alive, and the woman testified that she gave birth to the child, and upon its death, immediately after birth, placed it, without the knowledge of any person, in the cistern. Held, that the evidence did not warrant conviction."

We must not be understood as holding that the fact of the crime, and of the guilty agent cannot be established by circumstantial evidence. It can, by all authorities; but not on mere suspicion. Probably the case of *Cluverius* v. *Commonwealth,* 81 Va. 787, as well illustrates the application of the rule as any. But the facts shown in that case, which were many, including the marks on the face and the hands of deceased, and her general appearance, showing that she had been first struck on the head by some one and then thrown into the water, proved beyond any reasonable doubt that she had been foully dealt with. But the strength of that case is not paralleled by this, far from it. 'On the main theory of the State, that the child died from strangulation from the string tied around its neck, the main witness, the attending physician, said "no one could tell that." Why was he not examined on the more unerring evidences of suffocation and strangulation, present or absent, in the child? No one can tell that. At least no one did.

We are loath to disturb verdicts of juries in such cases; but upon the authorities cited, and the absence of important evidence, of which we must take judicial notice, we cannot with clear conscience allow defendant to go to prison on the record as presented.

Our opinion is to reverse the judgment and award defendant a new trial.

*Reversed, and New Trial Granted.*