729 S.E.2d 250

**STATE of West Virginia, Respondent**

v.

**Henry C. JENKINS, Petitioner.**

No. 11–0362.

Supreme Court of Appeals of West Virginia.

Submitted March 27, 2012.

Decided June 21, 2012.

E. Scott Stanton, Esq., Deputy Chief Public Defender, Fayette County Public Defender's Office, Fayetteville, WV, for Petitioner.

Brian D. Parsons, Esq., Fayette County Assistant Prosecuting Attorney, Fayetteville, WV, for Respondent.

PER CURIAM:

In this appeal, Henry C. Jenkins, defendant below (hereinafter "Petitioner"), challenges a June 28, 2010, order of the Circuit Court of Fayette County convicting him of "felony murder" and "child neglect resulting in death," and sentencing him to life with mercy for the felony-murder conviction, and a consecutive sentence of three to fifteen years for "child neglect resulting in death." Herein, Petitioner alleges the following assignments of error: 1) that the circuit court erred in allowing the State to proceed against him for the separate offenses of felony murder, "death of a child by a parent," and "child neglect resulting in death;" 2) that the evidence was insufficient to prove that Petitioner caused his son's death beyond a reasonable doubt; 3) that the circuit court erred in suppressing Petitioner's statement only during the State's case in chief; 4) that

the circuit court erred in allowing the State to use immaterial and gruesome photographs of the child's autopsy; and 5) that the circuit court erred in permitting the use of certain 404(b) evidence at trial. After thorough review of the petition for appeal, all matters of record and the briefs and argument of counsel, we find no error. We therefore affirm Petitioner's conviction.

## I.

## FACTUAL AND PROCEDURAL HISTORY

On November 19, 2008, Petitioner's fourteen-year-old son, C.C.J.[1], died at Women and Children's Hospital in Charleston, West Virginia. C.C.J., who suffered from cystic fibrosis, was later determined by autopsy to have two non-prescribed controlled substances, oxycodone and valium, in his blood stream. At the time of his death, C.C.J. resided with his father, Petitioner, in a mobile home in Fayette County, West Virginia. The child's mother, Naomi Griffith, was incarcerated at the time of C.C.J.'s death. Both of C.C.J.'s parents had been frequent abusers of pain prescription medications throughout his life. According to the record, C.C.J. had a life-long struggle with cystic fibrosis and had been in and out of hospitals many times during his childhood combating complications with his illness.

On the evening of November 13, 2008, several persons gathered at Petitioner's home. According to the evidence presented at trial, Holly Burdette arrived at the home around 10:00 p.m. after receiving a phone call from C.C.J. asking for a ride. Burdette was drinking with Marshall Walker and Shaun Stark and asked them to transport C.C.J. and Petitioner. They drove to the home of Josh Settle, a local drug dealer, where Petitioner traded Mr. Settle a bag of C.C.J.'s Jeff Gordon memorabilia collection for three oxycodone '30' pills. After the exchange, C.C.J. went into Settle's house to see a knife. C.C.J. was alone with Settle during this time. Settle denied giving C.C.J. any drugs.

1. Consistent with this Court's customary practice, we will refer to the minor by his initials rather than by his full name. *See, e.g., In re N.A.,* 227 W.Va. 458, 711 S.E.2d 280 (2011).

Burdette testified at trial that, of the three oxycodone pills that Petitioner obtained from Settle, she only saw two. Petitioner gave her one of the pills, whereupon she and Stark went to a neighbor's trailer. After visiting with neighbors, Burdette and Stark returned to the Jenkins home. Upon their return, Burdette found C.C.J. on the front porch vomiting. She testified that she, Petitioner, and C.C.J. then stayed up for a few more hours. C.C.J. and Petitioner eventually fell asleep on the couch, while Burdette slept on the floor with Stark.

Burdette testified that she woke C.C.J. up around 5:00 a.m. and asked him if he was feeling better. She testified that C.C.J. responded that he did. She then drifted off to sleep and woke approximately two hours later. When she awoke around 7:00 a.m., Petitioner was already awake sitting up in a chair smoking a cigarette. She heard what she described as a gargling noise and determined it was coming from C.C.J. Stark began performing CPR on C.C.J. Burdette testified that at some point she heard Petitioner on the phone and she believed that Petitioner did not realize the seriousness of C.C.J.'s condition. They then placed C.C.J. in a cold shower and Petitioner tried to revive C.C.J. Petitioner then called an ambulance. Upon their arrival, the EMTs described C.C.J. as having blue skin and was essentially not breathing. He collapsed into a vegetative state. C.C.J. died on November 19, 2008, after being removed from life support.

Burdette testified that Petitioner told her sometime after C.C.J.'s funeral that he felt responsible for C.C.J.'s death because he had "shot C.C.J. up with an oxycontin 30." On cross-examination, Burdette testified that on the night of November 13, 2008, she had approximately ninety valium pills in her possession. She testified that when she woke up and found Petitioner awake, he asked her for a valium. When she went to her purse she found all of the pills missing.

Detective J.K. Sizemore of the Fayette County Sheriff's Department investigated the case. Detective Sizemore obtained recorded telephone conversations which were admitted at trial between Petitioner and C.C.J.'s mother, Naomi Griffith, while she was an inmate at Lakin Correctional Facility. During one of the conversations, Petitioner admitted to Ms. Griffith that C.C.J. had "snorted" a "30." In another phone call he stated that C.C.J. had been obtaining drugs from "other places too."

Dr. Zia Sabet of the West Virginia Medical Examiner's Officer performed an autopsy on C.C.J. According to C.C.J.'s death certificate, the immediate cause of his death was "hypoxic encephalopathy due to broncho-pneumonia and cystic fibrosis." The other significant condition listed was diabetes mellitus, Type I. The certificate was signed by Dr. Zia Sabet. The death was classified as "natural" on the certificate.

The official toxicology report issued by Dr. James Kraner, Chief Toxicologist of the State Medical Examiner's office, on January 21, 2009, states that traces of oxycodone in the blood samples first taken at the hospital on November 14, 2008, were 0.06 mg/L, and that diazepam and nordiazepam [2] were found at levels of 0.04 mg/L and 0.15 mg/L respectively. All of these levels were considered to be therapeutic.[3] Blood samples taken at the time of C.C.J.'s death contained similar levels of diazepam and nordiazepam.

On May 22, 2009, Detective Sizemore obtained an arrest warrant for Petitioner charging him with "death of a child by a parent" in violation of W. Va.Code § 61–8D–2a. Petitioner was arrested and taken into custody on May 27, 2009. Subsequently, on July 28, 2009, Dr. Sabet and Dr. Kaplan issued a "Report of Death Investigation and Post–Mortem Examination Findings." The reports states that

> "It is our opinion that [C.C.J.], a 14–year-old male teenager, died as the result of combined oxycodone and diazepam intoxi-

---

**2.** Diazepam is found in valium. Nordiazepam is a metabolite that the body produces after the ingestion of valium.

**3.** Dr. James Kraner testified that the term "therapeutic level" is a blood concentration range typically expected when an individual has been using a controlled substance in the manner that a physician would prescribe.

cation resulting in fatal hypoxic encephalopathy following a 5–day hospitalization, without documented prescription access to oxycodone and diazepam. Cystic Fibrosis and insulin dependent diabetes mellitus are potentially contributory conditions."

As to the manner of death, the report states,

"[g]iven the uncertain circumstances surrounding the acquisition and fatal abuse of pharmaceuticals by this minor child, as well as the potentially contributory role of unreported caretaker neglect to provide timely medical rescue, the manner of death is best classified as Undetermined."

Petitioner was indicted before the Fayette County Grand Jury for the felony offenses of "felony murder" in violation of W. Va.Code § 61–2–1; "delivery of a controlled substance, to-wit oxycodone" in violation of W. Va.Code § 60A–4–401; "death of a child by a parent, guardian or custodian" in violation of W. Va.Code § 61–8D–2a; and "child neglect resulting in death" in violation of W. Va.Code § 61–8D–4a(a).

At the jury trial, the Court agreed to instruct the jury that the charge contained in count four, "child neglect resulting in death" (W. Va.Code § 61–8D–4a(a)) is a lesser included offense of count three, "death of a child by a parent" (W. Va.Code § 61–8D–2a). Following the close of evidence, during deliberations, the jury passed a note to the bailiff with the following question: "Does the felony that was committed have to *cause* the death or *contribute* to it?" (emphasis in original). After argument of counsel, the Court passed a note back to the jury stating,

Ladies and gentlemen of the jury, I have received your note and regret that I am unable to further answer the question you asked. I know you were attentive to the instructions as they were read to you by the Court. They cannot be read to you again. Each individual should rely upon their own memory in answering the question. You may now continue to deliberate toward verdicts in this case.[4]

Following several more hours of deliberation, the jury returned a verdict finding Petitioner guilty of the offense of "felony murder" (with a recommendation of mercy), and guilty of the offense of "child neglect resulting in death" as a lesser included offense of "death of a child by a parent, guardian or custodian." By sentencing order dated June 28, 2010, the circuit court sentenced Petitioner to consecutive sentences of life with a recommendation of mercy on the count of felony murder, and three to fifteen years on the count of "child neglect resulting in death." Following sentencing, Petitioner filed the instant appeal.

## II.

### STANDARD OF REVIEW

When a Petitioner raises a sufficiency of the evidence argument, this Court follows the standard of review set forth in Syllabus Point 3 of *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995), which provides that:

A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

This Court has also stated that:
The function of an appellate court when reviewing the sufficiency of the evidence to

---

**4.** The specific felony murder instruction given to the jury in this case is discussed in further detail below.

support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

*Id.,* Syl. Pt. 1.

We review a circuit court's exclusion of evidence under an abuse of discretion standard. "[R]ulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion." *State v. Guthrie,* 205 W.Va. 326, 332, 518 S.E.2d 83, 89 (1999) (*quoting State v. Louk,* 171 W.Va. 639, 643, 301 S.E.2d 596, 599 (1983), *citing* Syl. Pt. 2, *State v. Peyatt,* 173 W.Va. 317, 315 S.E.2d 574 (1983)).

" 'The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion.' Syl. pt. 5, *Casto v. Martin* [159 W.Va. 761], 230 S.E.2d 722 (W.Va.1976) citing Syl. pt. 10, *State v. Huffman,* 141 W.Va. 55, 87 S.E.2d 541 (1955).' Syllabus Point 2, *State v. Rector,* [167] W.Va. [748], 280 S.E.2d 597 (1981).' Syl. pt. 3, *State v. Oldaker,* [172] W.Va. [258], 304 S.E.2d 843 (1983)."

Syllabus Point 6, *State v. Kopa,* 173 W.Va. 43, 311 S.E.2d 412 (1983).

With these standards in mind, the parties' arguments will be considered.

## III.

## DISCUSSION

### A. Election of Charges

In his first assignment of error, Petitioner maintains that the circuit court erred in allowing the State to proceed against him for the offenses of "felony murder," the underlying felony being delivery of oxycodone; "death of a child by a parent," the cause of death being "impairment of physical condition by delivery of oxycodone;" and "child neglect resulting in death," the neglect allegedly being "allowing or permitting child to abuse oxycodone." Petitioner's counsel filed a "Motion to Elect" requesting that the State elect a count in the indictment and a theory under which to proceed. Another similar motion was made by Petitioner while arguing for a judgment for acquittal after the end of the State's case, and then again at the close of evidence. Petitioner alleges that the issue was also addressed during discussions regarding instructions and how to draft the verdict form.

Petitioner argues that the circuit court failed to require the State to elect a theory of prosecution in two different manners. First, Petitioner argues that it was inappropriate for the State to indict for felony murder alleging a specific felony of delivery of a controlled substance in count one of the indictment, and then indict for that same underlying felony in count two of the indictment. Indeed, this Court has held that

"[d]ouble jeopardy prohibits an accused charged with felony murder, as defined by W. Va.Code § 61-2-1 (1977 Replacement Vol.) from being separately tried or punished for both murder and the underlying enumerated felony." Syllabus point 8, *State v. Williams,* 172 W.Va. 295, 305 S.E.2d 251 (1983).

Syl. pt. 8, *State v. Giles,* 183 W.Va. 237, 395 S.E.2d 481 (1990).

It would have been clear error in this case for Petitioner to be convicted of both the offense of felony murder and the underlying offense of delivery of a controlled substance. However, when the circuit court prepared the verdict form and sent the charge of felony murder to the jury, the charge of "delivery of a controlled substance" in count two was not given to the jury as a separate and distinct offense upon which a verdict of guilt could be returned. This Court has previously stated that "[t]he granting of a motion to force the State to elect rests within the discretion of the trial court, and such a decision will not be reversed unless there is a clear abuse of discretion." Syl. Pt. 3, *State v. Walker,* 188 W.Va. 661,

425 S.E.2d 616 (1992). When we review the nature of the charges for which Petitioner was indicted, we conclude that the State could have reasonably established the requisite malice or intent required for proving the offense of "death of a child by a parent" by proving that Petitioner delivered a controlled substance to his child that resulted in C.C.J.'s death. Thus, we find no abuse of discretion by the circuit court in waiting until it prepared the verdict form to dismiss count two of the indictment. The jury was not permitted to consider the underlying offense of delivery of a controlled substance as a separate and distinct felony offense. Thus, we find no error on this issue.

■ Additionally, Petitioner alleges that the circuit court failed to require the State to elect between a prosecution theory of felony murder or "death of a child by a parent." In other words, fundamentally, Petitioner alleges that it violated double jeopardy to prosecute him for both offenses that arose from the single act of delivering a controlled substance to his child. Petitioner maintains that our Legislature has not explicitly permitted multiple prosecutions for different offenses arising from a single act. We conclude that Petitioner's allegation is without merit.

■ This Court has held that "[t]he Double Jeopardy Clause in Article III, Section 5 of the West Virginia Constitution, provides immunity from further prosecution where a court having jurisdiction has acquitted the accused. It protects against a second prosecution for the same offense after conviction. It also prohibits multiple punishments for the same offense."

Syllabus Point 1, *Conner v. Griffith,* 160 W.Va. 680, 238 S.E.2d 529 (1977). When the jury returned its verdict in this case, Petitioner was not convicted of the offense of "death of a child by a parent." Rather, he was convicted only of the lesser included offense of "child neglect causing death."[5] Because Petitioner was not convicted of the

offense which he claims violates double jeopardy, "death of a child by a parent," Petitioner fails to demonstrate that he suffered multiple punishments or any similar other harm by allowing the jury to consider this charge along with the charge of felony murder. While perhaps it would have been more appropriate for Petitioner to allege a double jeopardy violation regarding the two offenses for which he was actually convicted, felony murder and "child neglect . resulting in death," Petitioner's counsel represented during oral argument that he is not appealing Petitioner's conviction for this offense. Accordingly, we will not consider that issue.

### B.   Sufficiency of Evidence

In the next assignment of error, Petitioner alleges that in proceeding under a felony murder theory, the State's evidence was insufficient to prove that: 1) the delivery of the oxycodone itself caused the death of C.C.J. and 2) that Petitioner delivered either of the controlled substances, oxycodone or valium, to C.C.J. We will address each of these issues in turn.

### 1)  Causation

■ Petitioner bases his first argument primarily on the testimony of Dr. Kraner and Dr. Sabet who both opined that it was the combination of oxycodone and valium that caused C.C.J.'s death. Petitioner alleges that neither expert could opine that the oxycodone itself caused C.C.J.'s death. Further, Petitioner places great weight on the evidence indicating that both drugs found in C.C.J. were at "therapeutic" levels. Conversely, the State argues that there was sufficient evidence presented to the jury from which the jury could convict, and the jury did convict, Petitioner of felony murder.

The crux of Petitioner's argument, while rather inartful, appears to be that the State must prove that the delivery of the oxycodone was the sole cause of C.C.J.'s death in order to sustain his conviction. We reject this argument because it is wholly unsup-

---

5. Count four of the indictment, charging Petitioner with the offense of "child neglect resulting in death" in violation of W. Va.Code § 61–8D–4a(a), was dismissed and not presented to the jury as a separate count. Rather, the jury was permitted to consider this offense as part of count three, as a lesser included offense of the charge of "death of a child by a parent" under W. Va.Code § 61–8D–2a.

ported by the felony murder statute, W. Va. Code § 61–2–1 (1991), as well as our jurisprudence.

In 1991, the West Virginia Legislature added the felony offense of "manufacturing or delivering a controlled substance as defined in article four, chapter sixty-a of this code" to the specifically enumerated list of felonies that may be the basis for first degree murder. West Virginia Code § 61–2–1 (1991) provides the following:

Murder by poison, lying in wait, imprisonment, starving, or by any willful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, kidnapping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or *a felony offense of manufacturing or delivering a controlled substance* as defined in article four, chapter sixty-a of this code, is murder of the first degree. All other murder is murder of the second degree.

In an indictment for murder and manslaughter, it shall not be necessary to set forth the manner in which, or the means by which, the death of the deceased was caused, but it shall be sufficient in every such indictment to charge that the defendant did feloniously, willfully, maliciously, deliberately and unlawfully slay, kill and murder the deceased.

This Court has held that "[i]n any case of homicide there must be proof of the identity of the deceased and the causation of death." *State v. Myers,* 171 W.Va. 277, 280, 298 S.E.2d 813, 817 (1982). "Under our decisions, the corpus delicti consists in cases of felonious homicide, of two fundamental facts: (1) the death; and (2) the existence of criminal agency as a cause thereof. The former must be proved either by direct testimony or by presumptive evidence of the strongest kind, but the latter may be established by *circumstantial evidence or by presumptive reasoning upon the facts and circumstances of the case."* Syllabus Point 6, *State v. Beale,* 104 W.Va. 617, 141 S.E. 7, 141 S.E. 401 (1927). Unlike traditional first degree murder, felony-murder does not "require proof of the elements of malice, premeditation, or specific intent to kill. It is

deemed sufficient if the homicide occurs accidentally during the commission of, or the attempt to commit, one of the enumerated felonies." Syllabus Point 7, in part, *State v. Sims,* 162 W.Va. 212, 248 S.E.2d 834 (1978). "The felony-murder statute applies where the initial felony and the homicide are parts of one continuous transaction, and are closely related in point of time, place, and causal connection, as where the killing is done in flight from the scene of the crime to prevent detection or promote escape." Syl. Pt. 2, *State v. Wayne,* 169 W.Va. 785, 289 S.E.2d 480 (1982). We have explained, with regard to felony murder, that:

"The elements which the State is required to prove to obtain a conviction of felony murder are: (1) the commission of, or attempt to commit, one or more of the enumerated felonies; (2) the defendant's participation in such commission or attempt; and (3) the death of the victim *as a result of* injuries received during the course of such commission or attempt." *State v. Williams,* 172 W.Va. 295, [311,] 305 S.E.2d 251, 267 (1983).

Syl. Pt. 5, *State v. Mayle,* 178 W.Va. 26, 357 S.E.2d 219 (1987) (emphasis added).

In *State v. Durham,* 156 W.Va. 509, 195 S.E.2d 144 (1973), a voluntary manslaughter case, this Court discussed whether the criminal agency of the defendant caused the death of her husband, where the defendant had shot her husband, but the medical evidence revealed that the bullet wound by itself would not have caused the death. *Id.* at 516, 195 S.E.2d at 148. It was determined that the direct cause of death was a fatty liver, and the death was accelerated or triggered by administration of anesthesia during surgery to repair the wound or another chemical agent, or by trauma caused by the bullet. *Id.* at 513–15, 195 S.E.2d at 147–48. In other words, the wound would not have caused the death, but for the pre-existing physical disability and/or subsequent treatment. Neither of the doctors could say with certainty that either of these was the causative factor, but testified to the probability that one or the other triggered or accelerated the death. *Id.* at 520, 195 S.E.2d at 150.

In discussing the corpus delicti requirement of proving causation for purposes of obtaining a conviction for voluntary manslaughter, this Court stated:

> The law in practically every American jurisdiction, including West Virginia, is that the corpus delicti in cases of felonious homicide consists of two basic elements: (1) Death of the victim; and (2) the existence of a criminal agency as a cause thereof. 40 C.J.S. *Homicide* Section 186, pages 1086–1087; 40 Am.Jur.2d, *Homicide*, Section 4, page 297; *State v. Craig*, 131 W.Va. 714, 51 S.E.2d 283 [ (1948) ]; *State v. Koontz*, 117 W.Va. 35, 183 S.E. 680 [ (1936) ]; *State v. Beale*, 104 W.Va. 617, pt. 6 syl., 141 S.E. 401 [ (1927) ]. Most of the cases decided in West Virginia concerning the proof of the corpus delicti relate to establishing the death of the victim or to the existence of a criminal agency. *State v. Craig*, 131 W.Va. 714, 51 S.E.2d 283; *State v. Koontz*, 117 W.Va. 35, 183 S.E. 680; *State v. Lucas*, 103 W.Va. 743, 138 S.E. 393 [ (1927) ]; *State v. Gilfillen*, 96 W.Va. 660, 123 S.E. 578 [ (1924) ]; *State v. Roush*, 95 W.Va. 132, 120 S.E. 304 [ (1923) ]; *State v. Merrill*, 72 W.Va. 500, 78 S.E. 699 [ (1913) ]; *State v. Flanagan*, 26 W.Va. 116 [ (1885) ].

> . . .

> It is, of course, not indispensable to a conviction for murder that the wounds be the direct cause of death. It is sufficient if the initial wound caused the death indirectly through a chain of natural causes. Text writers in general take a uniform position on the effect of a pre-existing physical condition.

>> 'It is equally well settled that the consequences of an act which is the efficient cause of the death of another are not excused, nor is the criminal responsibility for causing death lessened, by the pre-existing physical condition of the person killed ... which rendered him unable to withstand the shock of the wound inflicted, and without which predisposed condition the blow would not have been fatal ...' 40 Am.Jur.2d, Homicide, Section 20, page 313.

> It is immaterial that the accused did not know that the deceased was in a feeble condition which facilitated the killing. 'Responsibility for homicide attaches to one who accelerates the death of a person in poor physical condition ...' 40 C.J.S. *Homicide*, Section 11(d), page 855. See also 40 Am.Jur.2d, *Homicide*, Sections 15–16, pages 306–07.

> It is also clear that foreseeability is not an element in the corpus delicti. Causation, as we consider it here, is not the type of causation involved in tort liability. It is not necessary that the defendant could have reasonably anticipated that her act would cause death. 40 C.J.S. *Homicide*, Section 11(d), page 856.

> As can be gleaned from this discussion, the great weight of authority in this country holds a defendant criminally responsible where he inflicts a wound resulting in death, even though the cause of death is related to the proper treatment of the wound or such treatment or effect of a pre-existing physical disability of the victim. We hold this to be the law of this State governing this case.

> To hold, however, that the defendant in this case was responsible, we must find that the corpus delicti was established by direct evidence or by cogent and irresistible grounds of presumption and that such death was not due to natural or other causes in which the accused did not participate. *State v. Roush*, 95 W.Va. 132, 120 S.E. 304; *State v. Merrill*, 72 W.Va. 500, 78 S.E. 699.

> The death of the victim must be proved by direct testimony or by presumptive evidence of the strongest kind, but the existence of a criminal agency as the cause thereof, can be established by circumstantial evidence and presumptive reasoning from the facts and circumstances of the case. *State v. Beale*, 104 W.Va. 617, 141 S.E. 401; *State v. Merrill, supra; State v. Flanagan*, 26 W.Va. 116.

*Durham*, 156 W.Va. at 515–20, 195 S.E.2d at 148–50 (1973).

In recognizing these principles of law, this Court held in *Durham* that the medical testimony can be characterized at

least as circumstantial evidence relating to the cause of the death. *Id.* at 519–20, 195 S.E.2d at 150. The non-medical, circumstantial evidence on the question of causation was likewise properly presented to the jury. *Id.* The jury, thus properly instructed, had for its consideration direct and conclusive evidence of the death and competent circumstantial evidence that the defendant's criminal agency caused the death. *Id.* Accordingly, in *Durham,* this Court could not conclude that the jury was wrong. *Id.* at 518–20, 195 S.E.2d at 150–51. In so holding, the Court established the following two syllabus points:

> In order to sustain a conviction for felonious homicide, the corpus delicti is properly proved by sufficient evidence showing that the initial wound caused the death *indirectly through a chain of natural causes.*

*Id.,* Syl. Pt. 2. (Emphasis added).

> A defendant may be held criminally responsible where he inflicts upon another a wound resulting in death, even though the cause of death is related to the proper treatment of the wound or related to such treatment or effect of a pre-existing physical disability of the victim.

*Id.,* Syl. Pt. 3.

■ Petitioner suggests that this Court's opinion in *State v. Rodoussakis,* 204 W.Va. 58, 511 S.E.2d 469 (1998), a case involving felony murder with the underlying felony being "delivery of a controlled substance," is determinative for the purposes of the instant appeal. In *Rodoussakis,* the defendant raised two separate arguments regarding the failure of the State to prove its case against the defendant beyond a reasonable doubt. *Id.* at 64, 511 S.E.2d at 475. First, the defendant contended that the State's evidence was insufficient to trigger application of the felony murder statute. *Id.* Specifically, the defendant asserted that the felony murder statute did not apply in drug overdose cases. *Id.* The defendant argued that by using the word "murder" in W. Va.Code § 61–2–1, the Legislature intended that the felony murder rule apply only in cases of intentional death. *Id.* at 65 n. 3, 511 S.E.2d at 476, n. 3. In concluding that the defendant's intent, or lack thereof, to cause a drug overdose was not central to a consideration

of whether the felony murder statute applied, this Court noted that "where a homicide occurs in the course of, or as a result of, a separate, distinct felony, the felonious intent involved in the underlying felony may be transferred to supply the intent to kill necessary to characterize the homicide as murder." *Id.* at 65, 511 S.E.2d at 476, n. 3 (citing *State v. Young,* 173 W.Va. 1, 16–17, 311 S.E.2d 118, 134 (1983)) (emphasis added). Applying the clear and unambiguous language of W. Va.Code § 61–2–1 and the intent of the Legislature in enacting the statute, we held that

> [p]ursuant to W. Va.Code § 61–2–1 (1991), death resulting from an overdose of a controlled substance as defined in W. Va.Code § 60A–4–401 *et seq.* and occurring in the commission of or attempt to commit a felony offense of manufacturing or delivering such controlled substance, subjects the manufacturer or deliverer of the controlled substance to the felony murder rule.

*Id.,* Syl. Pt. 3.

Next, the defendant in *Rodoussakis* argued that there was no evidence showing whether the morphine which actually caused the victim's death was delivered to the victim by the defendant, or whether it was self-administered without the defendant's involvement. *Id.* at 65, 511 S.E.2d at 476–77. However, this Court declined to address this specific assignment of error, finding that while the defendant sought relief below asserting that there was insufficient evidence that morphine, as opposed to other drugs in the victim's system, caused the victim's death, the defendant *failed to argue below that there was insufficient evidence that the defendant's morphine, rather than the victim's own morphine, caused the victim's death.* *Id.* at 65–66, 511 S.E.2d at 476–77. Thus, this Court concluded that the issue had not been appropriately preserved for purposes of appeal. *Id.* at 66, 511 S.E.2d at 477.

Here, Petitioner contends that the State's evidence did not sufficiently prove that the oxycodone caused C.C.J.'s death because Dr. Sabet did not offer any testimony as to which drug, the oxycodone or the valium, was the lethal or first effective drug, as he did in the *Rodoussakis* case. Petitioner points to the

medical testimony presented by Dr. Sabet in *Rodoussakis*, where he opined that the cause of death was "multiple drug intoxication ... the first effective drug was morphine, the second alcohol, and the third cocaine." Dr. Sabet concluded that if the morphine were taken out of the victim's system, he would not have died when he did. Two other experts agreed with this conclusion. *Id.* However, as stated above, this Court did not consider the issue of whether there was sufficient evidence to prove that the defendant's act of delivering morphine to the victim caused the victim's death because the issue had not been properly preserved for purposes of appeal. Thus, we do not find *Rodoussakis* helpful in determining the issue before us.

Taking all of these prior decisions into consideration, we conclude in order to obtain a conviction for felony murder, all that the State was required to prove was that the death was simply *a result of* the delivery of the oxycodone. Nothing in our prior jurisprudence leads us to conclude that the State was required to prove that the delivery of the oxycodone was the sole cause of C.C.J.'s death. Thus, we cannot say that the circuit court erred in determining that the evidence was sufficient to prove that C.C.J.'s death was the result of the delivery of the oxycodone by Petitioner.

◼ In this case, the State presented evidence that Petitioner traded C.C.J.'s Jeff Gordon memorabilia collection for three oxycodone pills and that Petitioner delivered a pill to C.C.J.[6], which resulted in his death. The July 28, 2009 "Report of Death Investigation and Post–Mortem Examination Findings" issued by Dr. Sabet and Dr. Kaplan states that

> "It is our opinion that [C.C.J.], a 14–year-old male teenager, died *as the result of combined oxycodone and diazepam intoxication* resulting in fatal hypoxic encephalopathy following a 5–day hospitalization, without documented prescription access to oxycodone and diazepam. Cystic Fibrosis

and insulin dependent diabetes mellitus are potentially contributory conditions."

As to the manner of death, the report states,

> "[g]iven the uncertain circumstances surrounding the acquisition and fatal abuse of pharmaceuticals by this minor child, as well as the potentially contributory role of unreported caretaker neglect to provide timely medical rescue, the manner of death is best classified as Undetermined."

(Emphasis added).

While Dr. Sabet and Dr. Kaplan determined that the drugs found in C.C.J.'s blood were at a therapeutic levels, Dr. Sabet explained during his testimony at trial that a patient with cystic fibrosis may not be able to properly metabolize even a therapeutic concentration of these drugs. Shedding further light on his conclusions regarding the manner of death, Dr. Sabet offered the following testimony:

Q: Doctor, would you explain for us—in arriving at your cause of death, would you explain to the jury how, if at all, the presence of these controlled substances in this boy's body impacted or affected your ultimate conclusion in this case?

A: When you have multi-system organ failure, like the liver cirrhosis, pancreas, cystic fibrosis, lungs, he cannot breathe very well because of the mucous and other pathology findings that I cannot explain it here. And you see on the (unintelligible) examination, this person is defective, means he is—he cannot resist even normal concentration of drug. Even therapeutic concentration of prescribed drug could affect—could then metabolize or metabolize this drug from the system and could affect fatal consequence of this drug, even in normal persons like you and me.

Q: If—let me ask you this question and see if—see how this goes. Tell us, Doctor, looking at your report, which you have a copy of, what did you ultimately come to an opinion in terms of the cause of death and the manner of death?

A: Cause of death for this 14–year-old male teenager is combined oxycodone

---

6. The evidence establishing the delivery of oxyco-   done is discussed in detail below.

and diazepam intoxication, based on this organ failure, and cystic fibrosis associated with diabetes mellitus, which is what Type I is from the chart that he had, could be contributing factor to his death.

And manner is, because of the not therapeutic concentration of the oxycodone and Valium, and also (unintelligible) of reported caretaker's neglect to provide timely medical rescue, because based on the investigation that we received by the law enforcement, this father a few times rejected to take this teenager to the medical facility and even tried to treat in the tub with the ice or cold water.

These all could be contributing factors to his death. And manner of death is classified as undetermined, because we don't know really if this therapeutic drug concentration—I'm not hundred percent sure.

Thus, based on the fact that C.C.J. had a pre-existing condition, of which Petitioner was acutely aware, that rendered him unable to properly metabolize the oxycodone, and the medical experts' opinion that the cause of C.C.J.'s death was combined oxycodone and diazepam intoxication, we find that the evidence sufficiently established that the oxycodone in C.C.J.'s system resulted in his death. In *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995), this Court held that "[t]he function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted to trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." *Id.*, Syl. Pt. 1. When we review the evidence in this case in the light most favorable to the prosecution, we conclude that any rational trier of fact could have found the essential elements of the crime of felony murder proved beyond a reasonable doubt. Accordingly, we find no error with the circuit court's denial of Petitioner's motions for judgment of acquittal made during trial.

### 2) Delivery

■ In his second argument regarding the sufficiency of the evidence, Petitioner also alleges that the State failed to prove that he personally delivered the oxycodone to C.C.J. because no witnesses were presented that saw Petitioner give C.C.J. the pill. We accord this argument scant merit. At trial, Burdette provided testimony that although she never saw Petitioner give C.C.J. the third oxycodone pill that Petitioner got from Mr. Settle, Petitioner told her sometime after C.C.J.'s funeral that he felt responsible for C.C.J.'s death because he had "shot C.C.J. up with an oxycontin 30." The jury also heard evidence regarding several recorded phone calls between Petitioner and C.C.J.'s mother which could have led them to conclude that Petitioner delivered the oxycodone pill to C.C.J. Detective Sizemore obtained recorded telephone conversations which were admitted at trial between Petitioner and C.C.J.'s mother, Naomi Griffith, while she was an inmate at Lakin Correctional Facility. During one of the conversations, Petitioner admitted to Ms. Griffith that C.C.J. had "snorted" a "30." In another phone call he stated that he knew that C.C.J. had been obtaining drugs from "other places too."

In determining whether there is sufficient evidence to support a jury's verdict, "[a]n appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." Syl. Pt. 3, in part, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163. Assessing the above referenced evidence in the light most favorable to the prosecution, we find that the evidence was

sufficient for a jury to conclude that the element of delivery of the oxycodone had been proven beyond a reasonable doubt.

### C. Jury Instructions

Next, Petitioner alleges that the jury was not properly instructed and that it was therefore confused in determining whether the felony had to cause the death or contribute to it. The circuit court adopted the State's instruction regarding felony murder without objection from Petitioner's counsel regarding the statement of law contained therein. The felony murder instruction that the jury received at trial, provided, in pertinent part:

You may, if warranted by the law and the evidence, return one of the following verdicts as to Count 1 of the indictment: Guilty of murder in the first degree, a felony, as a result of the death of [C.C.J.] occurring during the commission of the felony crime of delivery of oxycodone, a controlled narcotic substance, with no recommendation of mercy; No. 2, guilty of murder in the first degree, a felony, as a result of the death of [C.C.J.] occurring during the commission of the felony crime of delivery of oxycodone, a controlled narcotic substance with a recommendation of mercy; No. 3, not guilty.

Murder in the first degree is committed when any person in the commission of the delivery of a controlled substance causes the death of another person. Under the felony murder doctrine, murder in the first degree does not require proof of the elements of willfulness, deliberation, premeditation, malice or specific intent to kill. It is deemed sufficient in law if the death occurs during the commission of the delivery of a controlled substance.

Delivery of oxycodone, a Schedule II narcotic controlled substance, is committed when any person unlawfully and feloniously delivers oxycodone, a Schedule II narcotic controlled substance, to another person.

Before the defendant, Henry C. Jenkins, can be found guilty of murder in the first degree, a felony murder, as a result of the death of [C.C.J.] occurring during the com-

mission of the felony crime of delivery of a controlled substance, the State of West Virginia must prove beyond a reasonable doubt the following: That the defendant, Henry C. Jenkins, in Fayette County, West Virginia, on or about November 14, 2008, did deliver oxycodone, a Schedule II narcotic controlled substance, to [C.C.J.] and that [C.C.J.] died as a result of the defendant committing the crime of delivery of a controlled substance.

If you should find the defendant, Henry C. Jenkins, guilty of murder in the first degree, a felony murder, as a result of the death of [C.C.J.] occurring during the commission of the felony crime of delivery of a controlled substance, you may, in your discretion, add to your verdict a recommendation of mercy.

During deliberations at trial, the jury passed a note to the bailiff with the following question: "Does the felony that was committed have to *cause* the death or *contribute* to it?" (Emphasis in original). The parties discussed at length whether the State was required by law to prove that the oxycodone caused C.C.J.'s death. In analyzing whether the instruction was a proper statement of the law, the circuit court noted that the felony murder statute does not contain the word "cause" or "contribute," rather it merely requires that the murder occur "in the commission of or attempt to commit the felony offense of delivering a controlled substance." The court also noted that West Virginia case law merely requires that "the initial felony and the homicide are parts of one continuous transaction, and are closely related of point in time, place and causal connection," *see* Syl. Pt. 2, in part, *State v. Wayne*, 169 W.Va. 785, 289 S.E.2d 480, and "the death of the victim as a result of injuries received during the course of such commission or attempt." *See* Syl. Pt. 5, in part, *State v. Mayle*, 178 W.Va. 26, 357 S.E.2d 219. Thus, the court decided that because the words "cause" and "contribute" were not an accurate reflection of the law, it would not re-read the previous instruction to the jury that the delivery of oxycodone had to cause the death.

The State then proposed that as an alternative, the court could simply read the lan-

guage contained in the felony murder statute instead. Petitioner's counsel objected and stated that the instruction that was read to the jury was the State's proposed instruction, not Petitioner's, and that the language used in that instruction is what the defense relied upon in its argument to the jury. Taking this into consideration, Petitioner's counsel suggested that it would be best to leave the issue alone and simply write a note to the jury stating that the court could not answer the question, as the jury had already heard the court's instructions. After the parties had opportunity to review and agree to the language contained therein, the judge returned a note to the jury stating

> Ladies and gentlemen of the jury, I have received your note and regret that I am unable to further answer the question you asked. I know you were attentive to the instructions as they were read to you by the Court. They cannot be read to you again. Each individual should rely upon their own memory in answering the question. You may not continue to deliberate toward verdicts in this case.

■ When we review the record and consider the series of events that occurred before the circuit court, we find that Petitioner has waived any argument that the court committed error in not providing further clarification on the issue of causation. Petitioner's counsel was the one who actually suggested that the court not answer the jury's question. Accordingly, Petitioner is foreclosed from claiming that this tactical decision was erroneous. Although the jury instruction admittedly confused the jury as to whether causation was required to prove felony murder, Petitioner was not prejudiced by having this instruction read to the jury. Even if the jury had inferred that the State had to prove that oxycodone itself "caused" the death of C.C.J., this would have been a heavier burden of proof for the State to carry to obtain a conviction. If anything, the instruction inured to the benefit of Petitioner.

### D. Suppression of Petitioner's Statement

■ Petitioner next contends that the circuit court's decision to suppress his statement only for purposes of the State's case in chief was erroneous. Detective Sizemore and Detective Ron Perdue went to the home of Petitioner on May 27, 2009, to interview Petitioner. Based on the investigation and the statements of other witnesses, Detective Sizemore had obtained a warrant for Petitioner on May 22, 2009. Detective Sizemore testified that at the interview on May 27, 2009, he read Petitioner his Miranda rights. The interview took place outside Petitioner's house and the parties apparently chatted amiably and smoked cigarettes along the road. The detectives never informed Petitioner of whether he was under arrest, or whether he was free to leave.[7] Petitioner was not placed in handcuffs during the interrogation, but was arrested immediately after the interview. Detective Sizemore admitted that he had the arrest warrant in his pocket during the interview.

Following a hearing on Petitioner's motion to suppress the statement, the circuit court concluded that the purpose and manner of conduct of the interview was to induce a statement, and thus suppressed the State's ability to utilize the statement in its case in chief. The court, however, denied the defense motion to prohibit the use of the statement for any purpose at trial and allowed its use on rebuttal to impeach Petitioner should he choose to testify at trial. Petitioner contends it was error for the circuit court to permit the use of this statement for impeachment purposes. Specifically, he contends that the court's ruling deterred him from testifying and thus, severely prejudiced his case. The State responds that although the circuit court's ruling permitted the statement

---

7. Detective Sizemore testified that at the interview, he read Petitioner his rights from a Miranda card he carries with him, which stated "You have the right to remain silent and refuse to answer questions. Anything you say can and will be used against you in a court of law. You have the right to talk to an attorney and to have an attorney present while you are being questioned. If you cannot afford an attorney, one will be provided to you without cost if you so desire. You can decide at any time to exercise these rights and not answer any questions or make any statements."

to be used on rebuttal for the limited purpose of impeachment, the State did not use the statement during the trial for any purpose out of an abundance of caution. Thus, it contends that Petitioner fails to demonstrate any prejudice caused by this ruling.

We find no error in the circuit court's ruling. As this Court explained in *State v. Goff,* 169 W.Va. 778, 289 S.E.2d 473 (1982), examination of a confession involves two distinct voluntariness inquiries. Where a confession is obtained in violation of *Miranda,* it is involuntary in law and is inadmissible in the State's case. *Id.* at 782, 289 S.E.2d at 476. The confession may, however, be used to impeach the defendant's trial testimony, provided it was not the product of improper coercion. *Id.* at 782–83, 289 S.E.2d at 476. We stated the applicable rule in Syllabus Point 4 of *State v. Goodmon,* 170 W.Va. 123, 290 S.E.2d 260 (1981):

> Where a person who has been accused of committing a crime makes a voluntary statement that is inadmissible as evidence in the State's case in chief because the statement was made after the accused had requested a lawyer, the statement may be admissible solely for impeachment purposes when the accused takes the stand at his trial and offers testimony contradicting the prior voluntary statement knowing that such prior voluntary statement is inadmissible as evidence in the State's case in chief.

*Id.*

Here, the circuit court determined that the statement at issue, while voluntarily made, was custodial in nature and in violation of the prompt presentment rule. The court made detailed findings of fact and conclusions of law, finding that there was no physical or egregious mental coercion during the interrogation process that operated to override Petitioner's freewill, thus rending his statement involuntary in fact and improper for any purpose. *See* Syllabus Point 2 of *State v. Goff,* 169 W.Va. 778, 289 S.E.2d 473 (1982) ("A confession that has been found to be involuntary in the sense that it was not the product of the freewill of the defendant cannot be used by the State for any purpose at trial."). Furthermore, although circuit court's ruling correctly permitted the statement to be used on rebuttal for the limited purpose of impeachment, the State never even introduced the statement during trial for any purpose.

This Court has held that "[i]t is a well-established rule of appellate review in this state that a trial court has wide discretion in regard to the admissibility of confessions and ordinarily this discretion will not be disturbed on review." *State v. Vance,* 162 W.Va. 467, 250 S.E.2d 146 (1978). "A trial court's decision regarding the voluntariness of a confession will not be disturbed unless it is plainly wrong or clearly against the weight of the evidence." *Id.,* Syl. Pt. 3. Because we cannot find, following a review of the record, that the circuit court's ruling was plainly wrong, we accord deference to the circuit court's determination of admissibility of Petitioner's statement.

### E. Gruesome Photographs

In this assignment of error, Petitioner contends that the circuit court erroneously permitted the admission of certain gruesome photographs of C.C.J.'s body which were taken during the autopsy. Petitioner contends that these photographs, which depicted abrasions on C.C.J.'s back, were not probative of anything other than to theorize about the origin of the scratches. Petitioner contends that the photographs were disturbing to the jury and were designed to simply remind the jury of the overall tragedy of the situation.

This Court has held that "[t]he admissibility of photographs over a gruesome objection must be determined on a case-by-case basis pursuant to Rules 401 through 403 of the West Virginia Rules of Evidence." Syl. Pt. 8, *State v. Derr,* 192 W.Va. 165, 451 S.E.2d 731 (1994). Furthermore,

> Although Rules 401 and 402 of the West Virginia Rules of Evidence strongly encourage the admission of as much evidence as possible, Rule 403 of the West Virginia Rules of Evidence restricts this liberal policy by requiring a balancing of interests to determine whether logically relevant is legally relevant evidence. Specifically, Rule 403 provides that although relevant, evi-

dence may nevertheless be excluded when the danger of unfair prejudice, confusion, or undue delay is disproportionate to the value of the evidence.

Syl. Pt. 9, *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994). We have specifically stated that

> Rule 401 of the West Virginia Rules of Evidence requires the trial court to determine the relevancy of the exhibit on the basis of whether the photograph is probative as to a fact of consequence in the case. The trial court then must consider whether the probative value of the exhibit is substantially outweighed by the counterfactors listed in Rule 403 of the West Virginia Rules of Evidence. As to the balancing under Rule 403, the trial court enjoys broad discretion. The Rule 403 balancing test is essentially a matter of trial conduct, and the trial court's discretion will not be overturned absent a showing of clear abuse.

Syl. Pt. 10, *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994).

The photograph at issue in this case was admitted into evidence during Dr. Sabet's testimony, when Dr. Sabet opined that the scratches found on C.C.J.'s body were "typical effects of the opiate" oxycodone. Dr. Sabet's testimony was corroborated by aid of the photograph, in that he was able to not only describe what he observed and how his observation aided in forming an opinion, but was able to show the jury firsthand what he saw. Additionally, the photograph did not show the face of the victim, but rather the lower back portion of his body. The picture did not show any blood, bones, or other gory aspect of the autopsy. Rather, the photograph showed several scratches on the victim's back similar to a scratch one might receive from a thorn. Based upon the photograph, a viewer could not determine that the subject of the photo was even deceased. Accordingly, we find that the circuit court's admission of this photograph was not erroneous. We therefore find Petitioner's arguments on this issue unavailing.

## F. 404(b) Evidence

In his final assignment of error, Petitioner alleges that the circuit court erred in permitting the use of 404(b) evidence of Ms. Griffith and Ms. Paruscio against Petitioner at trial. Both of these witnesses were permitted to testify regarding certain prior incidents where C.C.J. had obtained illegal substances with Petitioner's knowledge or cooperation. Petitioner contends that the use of this evidence was highly prejudicial and had little probative value to assist the jury.

In interpreting the requirements of Rule 404(b) of the W. Va. Rules of Criminal Procedure, this court has held that

> [t]he exceptions permitting evidence of collateral crimes and charges to be admissible against an accused are recognized as follows: the evidence is admissible if it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; and (5) the identity of the person charged with the commission of the crime on trial.

*State v. Hanna*, 180 W.Va. 598, 606 n. 9, 378 S.E.2d 640, 648 n. 9 (1989); *see also State v. Dillon*, 191 W.Va. 648, 447 S.E.2d 583 (1994). Here, the evidence at issue was offered to prove that distributing controlled substances to C.C.J. in this matter was not in any way an accident on the part of Petitioner. In other words, this evidence was used to show that Petitioner acted with intent in delivering oxycodone to C.C.J., an element required to prove the underlying offense of delivery of a controlled substance and the intent element of the offense of "death of a child by a parent." In reviewing the record, we find that the circuit court properly conducted an *in camera* hearing where Petitioner was informed both in writing and orally what the State's evidence would be at trial. Accordingly, we conclude that the circuit court did not commit error in permitting the admission of this 404(b) testimony during the trial in this matter.

## IV.

## CONCLUSION

After thorough consideration of each of the separate assignments of error presented by Petitioner on appeal, for the foregoing reasons, we conclude that the June 28, 2010, order of the Circuit Court of Fayette County convicting Petitioner of "felony murder" and "child neglect resulting in death," and sentencing him to life with mercy for the felony murder conviction, and a consecutive sentence of three to fifteen years for child neglect resulting in death should be affirmed.

**Affirmed.**